(No. 63937.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT GENE TURNER, Appellant.

*Opinion filed April 20, 1989.—Rehearing
denied June 28, 1989.*

544

Charles M. Schiedel, Deputy Defender, and Gary S. Rapaport, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, and Elizabeth D. Caddick, law student, for appellant, and Robert G. Turner, of Menard, appellant *pro se*.

Neil F. Hartigan, Attorney General, of Springfield (Robert Ruiz, Solicitor General, and Terence M. Madsen and Joan G. Fickinger, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE RYAN delivered the opinion of the court:

Defendant, Robert Turner, and two other men were charged in an information in the circuit court of Macoupin County with one count each of murder, aggravated criminal sexual assault, criminal sexual assault, aggravated kidnapping, kidnapping, unlawful restraint, and robbery. The trial court granted a motion to sever the three defendants' trials. Following a jury trial, Turner was found guilty of the charged offenses. In a death penalty hearing the jury found that there existed one or more of the factors set forth in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) and there existed no mitigating factors sufficient to preclude a sentence of death. Defendant was sentenced to death, and the sentence was stayed (107 Ill. 2d R. 609(a)) pending appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603). The court also sentenced the defendant to 30 years' imprisonment for aggravated criminal sexual assault, 15 years' for criminal sexual assault, 15 years' for aggravated kidnapping, 7 years' for kidnapping, 3 years' for unlawful restraint and 7 years' for robbery.

On July 13, 1985, the defendant, his brother Michael Turner, and Daniel Hines went fishing. While fishing or later that evening, they discussed "getting some girls." Their plan was to pretend they were policemen and follow a car with a woman in it. They would then pull the car over by the use of a red flashing light, similar to one a police car has.

After fishing, they waited for and followed a number of cars, looking for the right person. When they spotted the car driven by 17-year-old Bridget Drobney, they turned the light on and she pulled over to the side of the

road. Hines exited his vehicle, approached Drobney's car and asked for her driver's license. Under the ruse that they had to take her to the station, Drobney was told to get into their car. The men then drove to a nearby cornfield. They parked the car on the side of the road, and Hines and the defendant took the girl six or seven rows into the cornfield. While Michael Turner waited by the road, Robert Turner and Hines beat Drobney and made her perform various sexual acts. A number of Drobney's possessions were taken and put into the car. Eventually, Hines and Michael turned the car around and called a number of times for the defendant to leave. The two heard noises, either a gurgling or a gasp for air, and then the defendant walked out of the cornfield holding a 10-inch-long knife. Later, the defendant told Hines and Michael that he had murdered Drobney. Drobney's body was found on July 17, 1985. She had suffered a stab wound to the neck and her throat had been slit. The defendant's sister, Sandra Aldridge, reported the incident to the police after Michael told her what had happened.

The defendant does not contest the sufficiency of the evidence. He first contends that he should be released because he was not tried within the 120-day time period which the speedy-trial statute demands. (Ill. Rev. Stat. 1985, ch. 38, par. 103—5(a).) The section prescribes that:

> "Every person in custody in this State for an alleged offense shall be tried by the court *** within 120 days from the date he was taken into custody unless delay is occasioned by the defendant." Ill. Rev. Stat. 1985, ch. 38, par. 103—5(a).

The defendant was arrested on July 18, 1985, and an arraignment date was set for August 13. Defendant's July 31 motion to postpone the arraignment until August 21 was granted. At the arraignment, the court set a September 23 trial date. On September 18, the defendant requested a continuance in the trial date, which the court granted. Over the defendant's objection, the three cases were severed on September 26. The defendant

agrees that he requested a number of continuances in the subsequent months. Eventually, the trial was set for March 17.

All parties understood that Hines' trial would be first, the defendant's trial next, and last would be Michael Turner's. On March 17, Hines' trial commenced with *voir dire*. On April 8, before completion of the Hines trial, a hearing was held to set a trial date for the defendant. The trial was set for June 2, 1986.

The parties first disagree on computation of the time from the arrest on July 18, 1985, until the March 17, 1986, trial date. The State urges that 42 days may be computed in calculating the speedy-trial time, and the defense argues that 59 days had passed. The State then argues that the 77 days from March 17 until the trial on June 2 are chargeable to the defendant because he expressly agreed to the trial date and he contributed to the delay. The defendant argues that his trial had been set for March 17, and at no time subsequent to that date did he request a continuance. Therefore, the defendant argues that he was tried 136 days after being taken into custody.

Section 103—5 is to be construed liberally to give effect to the constitutional right to a speedy trial, with each case decided on its own facts. (*People v. Beyah* (1977), 67 Ill. 2d 423, 427.) Under this section, it is the State's burden to bring the defendant to trial within the statutory time limit. (67 Ill. 2d at 427.) The 120-day time limit may be suspended temporarily for a number of reasons, such as delay occasioned by the defendant. In determining whether delay is occasioned by the defendant, the criterion is whether his acts in fact caused or contributed to the delay. (*People v. Nunnery* (1973), 54 Ill. 2d 372, 376.) On a motion to discharge, the defendant bears the burden of establishing facts which show a violation of the statute. (*People v. Jones* (1965), 33 Ill. 2d 357, 361.) "In resolving whether a delay is attributable to the defendant, much deference must be given to the

trial court's judgment, especially where it is difficult to discern from the record which party is primarily responsible for the problem. [Citations.] The decision of the trial court as to accountability for delay in bringing the defendant to trial should be sustained, absent a clear showing of abuse of discretion." *People v. Reimolds* (1982), 92 Ill. 2d 101, 107.

This issue may be resolved by analyzing the 77-day delay from May 17, the trial date the defendant first agreed to, until June 2, the date on which the trial eventually commenced. The first relevant date is January 10, 1986, when the three defendants appeared in court to request a continuance in the trial. At the hearing, counsel for Hines indicated that one basis for the continuance was so that a hair expert could be appointed to analyze pubic hairs which were found on the victim. The State's expert had indicated that some of the hairs could be identified as similar to each of the defendants' hairs. Robert Turner's counsel commented that the evidence was very damaging and that he would like an expert to examine the hair samples. He also stated that he was not in a hurry to go to trial; that March was bad and he would rather start sometime in mid-April. The cases were continued until February 3.

At a February 13 pretrial hearing, the defendant requested the appointment of additional counsel to assist in trial preparation, and for a continuance in the trial until March 17. The court granted both requests and indicated hope that the new attorney would not delay the trial further. The parties could not agree on an attorney and the court granted one week in order to find additional counsel. On February 20, the court made a docket entry which stated that an attorney had accepted the appointment. The attorney filed an appearance on April 3.

On February 21, Hines filed a motion for appointment of a hair expert. Defendant filed a similar motion on February 25. In the motion he stated that "in order to properly and adequately present a defense in the

above matter, it is necessary for the defendant" to have the hair sample independently examined by an expert. The defendant also stated that the examination would not delay the trial.

The Hines trial commenced on March 17. While the Hines trial was in progress, the court set a hearing for the Turner case on April 8. The following transpired:

"THE COURT: *** [T]he trial of Daniel Hines commenced on March 17, 1986, and still continues at this time. Any particular preference as to time, Mr. Hebron?

MR. HEBRON: No, your honor.

THE COURT: This case will go—Mr. Hines's will go two to three weeks. I don't know if you will be ready in May. Court has another case set in May. June would be an available date, first Monday in June. Any problem with that?

MR. HEBRON: No. As I said, we could do it in May or June.

THE COURT: June 2nd all right with you?

MR. HEBRON: All right with me whenever it is.

THE COURT: June 2 all right with you?

MR. TURNER: Yes.

THE COURT: Show the Defendant personally concurs in setting date of June 2nd. Will show then that this cause is set for jury trial on Monday, June 2, 1986, at 9:00 a.m. And it's set for pre-trial conference for Thursday, May 29, 1986, at 9:00 a.m."

On April 17, the parties appeared in court for a hearing on the defendant's motion for appointment of an expert to conduct hair examinations. The defendant's attorney explained to the court that the expert had not yet conducted an examination of the hairs and he would like the court to authorize him to do that. The court granted the motion.

At a pretrial conference on May 29, the defendant filed a motion for discharge due to violation of the speedy-trial act. At the hearing, he indicated that during the previous week he received an oral report on the results of the expert's examination and that the results were not helpful to his case; therefore, he was not going

to present testimony in rebuttal to the State's expert's analysis. The trial court denied the motion to discharge. The court conceded that it was unable to hear the case earlier, but found that the defendant had expressly agreed to the setting of the June 2 trial date and had never indicated that he was ready or wanted an earlier trial date. The trial judge assigned defendant's case to another judge because he did not think he should hear the case after having presided over the Hines trial.

We believe that the record establishes that the defendant contributed to the delay. The defendant knew that his trial would not commence until Hines' case was resolved and his actions indicate that he was not ready on March 17. At a hearing in January, he indicated that March was a bad time for him and he would prefer April or May. In February he requested appointment of additional counsel and filed a motion for appointment of an expert to examine evidence which was damaging and crucial to his case. In April he set a hearing for his motion to appoint an expert, and in May he acknowledged that there had been a mix-up and that the expert did not prepare a report of his findings until the end of May. The trial judge was justifiably under the impression that the parties were not ready for trial and in April he was merely suggesting a date which was agreeable to the parties and to the court's docket.

The defendant also expressly agreed to the setting of the trial date. Delay will not be attributed to the defendant on the basis of a silent record or if defendant fails to object to the State's request for a continuance. (*People v. Reimolds* (1982), 92 Ill. 2d 101, 106.) However, an express agreement to a continuance on the record is an affirmative act attributable to the defendant. (*Reimolds*, 92 Ill. 2d at 106; *People v. Gooding* (1975), 61 Ill. 2d 298, 301; *People v. Fosdick* (1967), 36 Ill. 2d 524, 530; *People v. Niemoth* (1951), 409 Ill. 111, 116.) The defendant and his attorney expressly agreed to the date chosen, with counsel repeating that he could try the case in May or

June. The defendant argues that there is a distinction between mere agreement to a date ordered by the court and an agreement by the defendant to a delay of the trial, citing *People v. Beyah* (1977), 67 Ill. 2d 423, and *People v. Wyatt* (1962), 24 Ill. 2d 151. Though there is a distinction, we do not find those two cases helpful for the defendant.

In *Beyah*, the court and attorneys were occupied in the trial of a different matter. The defendant appeared on a bond reduction motion. After denying the motion, the court required the defense to pick a trial date. When the court recommended a day, the defense counsel asked for an earlier date but the court denied the request. This court reasoned that it would be a mockery of justice to conclude that after counsel was ordered to pick a date the delay was attributable to him.

In this case, the court and the prosecutor were involved in other matters, but the trial date was not thrust upon the defendant. The defendant's actions indicated that more time was needed. When the court recommended a date, the defendant agreed that it was acceptable. This is unlike *Beyah*, where the defendant was forced to accept a date the court chose.

In *Wyatt*, the two defendants appeared at an arraignment. The trial court inquired whether they had attorneys, and the defendants responded that they had not obtained counsel yet but planned to hire one before the trial. The court said that if they thought they could get attorneys, he would continue the arraignment. The defendants agreed to hire attorneys and the arraignment was continued for two weeks. This court ruled that the two-week continuance could not be attributed to the defendants because "it was the court, and the court alone, which proposed and interjected the matter of a continuance." (24 Ill. 2d at 154.) The defendants merely stated that they would hire attorneys before the trial, not that they needed additional time to hire attorneys. In our case the continuance was not a matter of conven-

ience solely interjected by the judge, but rather one partly necessitated by the needs of the defendant.

Defendant has not met his burden of showing that the trial court abused its discretion. We realize that the State and judge were on trial with the Hines case, but we cannot accept that no part of this time can be attributed to the defendant. It is reasonable to assume from the record that the trial court did not believe the defendant was ready for trial and that the court believed it was accommodating the defendant in the setting of the trial, to which the defendant expressly agreed. Therefore, the motion to dismiss on this basis was properly denied.

The defendant next requests a new trial. First, he contends it was highly prejudicial and improper for the prosecutor to ask the defendant whether other witnesses were lying because their testimony was different from the defendant's. The State argues that the defendant waived this issue because, of the numerous instances of such cross-examination cited on appeal, only three were objected to at trial and the issue was not one of the 66 raised in defendant's three post-trial motions. We have recently affirmed the principle that, even in a capital case, to preserve an issue for appeal, an objection must be made at trial and raised in a post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186; *People v. Crews* (1988), 122 Ill. 2d 266, 274-75.) The failure to properly preserve an objection will limit our review to certain constitutional issues, questions on sufficiency of the evidence and issues involving plain error. (*Enoch*, 122 Ill. 2d at 190.) Therefore, unless plain error is involved, this issue is waived. The plain error doctrine will be invoked when the evidence is closely balanced, or if the error is of such a magnitude that the accused is denied a fair and impartial trial. *People v. Britz* (1988), 123 Ill. 2d 446, 472; *People v. Gacy* (1984), 103 Ill. 2d 1, 28.

The defendant testified that he spent the evening at the lake fishing and had nothing to do with the murder. This was contradicted by the evidence presented at trial,

which included testimony of Michael Turner, an acquaintance and the defendant's sister-in-law, who stated they saw the defendant in Hines' car the night of the murder, and two of the defendant's cellmates who heard the defendant explain what had happened on the night of the crime. At trial, the prosecutor attempted to have the defendant explain the discrepancies between his story and the testimony of the other witnesses. The defendant cites a number of instances where he claims the questioning was improper.

First, the arresting officer testified that when he went to the Turner home he asked to see Michael, but that the defendant interjected, "I'm over here if you want me." When Turner denied that he said this, he was asked if the officer was telling the truth. Defense counsel objected, but no ruling was made and the defendant did not answer.

Michael Turner next testified that his brother raped and killed the girl. When asked why his brother would say this, the defendant stated that he did not know.

Defendant also testified that at the time of his arrest he did not know why he had been arrested. Yet, one of his cellmates, Harold Meyers, testified as to what happened on July 13 and claimed that he learned the details from the defendant shortly after his arrest. On cross-examination, the defendant stated that the arresting officer must have given Meyers the information.

Meyers also testified that while in jail the defendant gave him a note to give to Michael. The note said that they should blame everything on Hines and outlined what Michael should say. A handwriting expert testified that the writing was the defendant's. At trial, the defendant denied he wrote the note and said he did not know why the expert would say that he had.

Shortly after the defendant was arrested and taken to court, he was found with a razor blade taped to his shoulder, a fork in his pant hem, and a wire and a knife-like instrument. When he testified that they were

Meyers', the prosecutor asked if perhaps he was the victim of some conspiracy by Meyers. The defendant agreed that Meyers must have planned for him to be caught. The officer who found the weapons testified that the defendant remarked, "You took my toys away from me." The officer responded that "those kinds of toys can be dangerous to your health," to which the defendant replied, "Not to mine." The defendant denied that he made such statements and said that he did not know why the officer would say them.

Michael Cox testified at trial that he had seen defendant in Hines' car the night of the crime. When asked why Cox would say that, defendant testified that he did not know. The defendant's sister-in-law also testified that she saw him in Hines' car. When asked if he had an explanation for her testimony, he said "no." He was also asked if the jury should believe her, and he said he was not saying whether to believe her or not. Defense counsel then objected when the State asked if she was reliable. The objection was overruled but defendant did not answer the question.

The prosecutor asked the defendant if he denies telling Meyers about specific events of the evening. The defendant denied discussing a murder with him. When asked again how Meyers obtained the information, defendant said that he did not know. Later, he was asked if he felt that everyone had conspired against him. Defense counsel objected and the objection was overruled, but no answer was given. Lastly, he answered in the affirmative when asked whether the people were telling untruthful things about him. In closing argument, the prosecutor used this testimony to point out to the jury that Turner had no explanation for the witnesses who testified against him.

The propriety of cross-examination is left largely to the discretion of the trial judge and he will not be reversed absent a clear abuse of discretion. (*People v. Burris* (1971), 49 Ill. 2d 98, 104; *People v. Izzo* (1958),

14 Ill. 2d 203, 212.) Though it is generally improper for the prosecutor to ask a defendant's opinion on the veracity of the other witnesses (*People v. Riley* (1978), 63 Ill. App. 3d 176, 185), it does not appear that the prosecutor humiliated or embarrassed the defendant. (See *People v. Lyles* (1985), 106 Ill. 2d 373, 402.) Instead, he attempted to have him explain his story in light of the overwhelmingly conflicting evidence. We fail to find that the trial court abused its discretion by allowing this questioning. (See *People v. Dowd* (1981), 101 Ill. App. 3d 830, 844.) Nor do we believe that the evidence was so closely balanced or that any error was of such a magnitude as to deny the defendant a fair trial. *People v. Wilson* (1984), 123 Ill. App. 3d 798, 804.

The defendant next contends that the prosecutor's comments during closing argument overstated the reliability of certain evidence. He concedes that no objection was made at trial, but contends there was plain error. A forensic scientist testified that he compared pubic hair samples of the defendant, Hines and Michael with hair found in pubic combings of the victim. The witness concluded that three may have come from the defendant, five may have been from Hines and one from Michael Turner; however, he was unable to positively identify the hairs as those of the defendant. During closing argument, the prosecutor argued:

> "[The expert] testified that some of these hairs are similar in characteristic as Daniel Hines, five of them. Three of them are similar in characteristic with the Defendant Robert Turner. How one of them was similar in characteristic with Michael Turner and he talked about the fact that he could not identify and he indicated to you that if you had more hairs from any of the standards that he could not rule out that these nine hairs could have been from the victim or that one of the three Defendants but he does place Daniel Hines, Robert Turner and Michael Turner's pubic hairs in these combings off of the victim Bridget Drobney."

In rebuttal he argued:

"You heard [the expert] testify that you can exclude people or you can say that the hairs are similar in characteristic to certain people. *** He doesn't know where those nine hairs came from but he did say if you had more samples of the standards they could have come from Bridget Drobney, [they] could have come from either one of the three Defendants. What he can say is that three of those hairs are similar in characteristic to Robert Turner. He can say it with enough assurance that it's allowed to be presented here as testimony. Its not speculation. *** [W]e know how the five hairs of Daniel Hines and the three hairs of Robert Turner got into the pubic hair combing of Bridget Drobney because we know of the crimes they committed against her."

The prosecutor also included the hair sample when he recited the list of evidence against the defendant which the jury should consider.

The defendant contends that these were misstatements of the only physical evidence connecting him to the victim, and claims that it is plain error to mischaracterize pubic hair evidence as conclusively establishing the identity of the defendant. (*People v. Linscott* (1987), 159 Ill. App. 3d 71.) The State counters that reasonable inferences were made from the evidence and testimony, and that the remarks were twice prefaced by stating that the hairs were "similar in characteristics" to the defendant's.

In *People v. Linscott* (1987), 159 Ill. App. 3d 71, the prosecutor clearly mischaracterized the evidence when he told the jury that a vaginal swab indicated that the victim had been raped by a nonsecretor, a person whose blood type cannot be detected in his body fluids, and that the defendant was a nonsecretor. This evidence was made up by the prosecutor because no one testified that the victim was raped or that the seminal material found came from a nonsecretor. The prosecutor also characterized the pubic hairs found on the victim as identical to the defendant's. Again, there had been no such testimony. Though no objection was made, the court held that the plain error doctrine applied because the evi-

dence was closely balanced and the mischaracterization of the evidence likely influenced the jury and deprived the defendant of a fair trial.

The situation in this case is distinguishable. First, there was ample testimony that linked the defendant to the crime. Second, the prosecutor twice stated that the hair evidence possessed *similar* characteristics, not that it was identical. The prosecutor may draw a reasonable inference from the evidence, and the jurors can evaluate the inference in light of their own recollection of the evidence. (*People v. Jones* (1988), 123 Ill. 2d 387, 411-12; *People v. Collins* (1985), 106 Ill. 2d 237, 278.) We do not believe that the jury was misled or that the prosecutor's argument constitutes reversible error, or that the prosecutor's comments constitute plain error.

Defendant also claims he was denied a fair trial when the prosecutor made unnecessary and highly improper attacks on the defense bar. Though no objection was made at trial, the issue was included in the post-trial motion and on appeal the defendant claims plain error applies. The State argues that at most it made a disparaging comment about a "yarn" the defense counsel told the jury and that it was not accusing defense counsel of unethical behavior.

At the end of defense counsel's closing argument, he told the jury a tale to illustrate that they should not be swayed by the appearances of guilt in the case because appearances may be deceiving. He told the jury about his great-great-grandparents who lived long ago in rural Iowa. During an especially cold winter, the husband became ill and the wife had to take him 20 miles to the nearest doctor. She left her baby at home, under the protection of their faithful dog. When she returned, the home was a shambles and the dog lay bloody and near death. Because she could not find the baby, she assumed the dog had killed it and in a fit of anger she shot the dog. Only then did she hear the baby cry, and when she found the baby, there lay nearby a dead wolf. Though it

appeared to her that the dog killed the baby, it had in fact saved the baby from the wolf.

In rebuttal, the prosecutor began by stating:

> "Ladies and gentlemen of the jury I think you can now begin to see [that] you'll get an instruction that what we attorneys say is not evidence or law in this case. I have done some defense work before I was State's Attorney and quite frankly I didn't like to do it because I felt that I could never exaggerate enough to be a good defense attorney. And, I sometimes wonder if we should ever have closing arguments. This is not a place for stories and quite frankly I don't believe the wolf story anymore than I believe the fish story."

Generally, it is improper to accuse defense counsel of perjury and fraud (*People v. Emerson* (1983), 97 Ill. 2d 487, 497-98; *People v. Monroe* (1977), 66 Ill. 2d 317, 324; *People v. Stock* (1974), 56 Ill. 2d 461, 468; *People v. Polenik* (1950), 407 Ill. 337, 348) or to characterize defense counsel as unethical or underhanded (*Bruno v. Rushen* (9th Cir. 1983), 721 F.2d 1193, 1195). But in analyzing the propriety of any statement, it must be read in context. The prosecutor's comment, taken in context, may have been directed to the overexaggeration involved in the wolf tale and not meant as an attack on the ethics or tactics of defense attorneys. We will not reverse a conviction where it does not appear that justice has been denied or that the finding of guilt resulted from an error. (*People v. Richardson* (1988), 123 Ill. 2d 322, 343-44.) Certainly, this statement did not deny the defendant a fair trial and was no more than harmless error.

Defendant's next claim concerns evidence of his attempt to escape after arrest. The court denied two motions *in limine* to exclude evidence which established that at defendant's first court appearance after his arrest he was found with a number of weapons. The officer who found the weapons testified that defendant made incriminating remarks concerning the weapons. Defendant's cellmate testified that the defendant had planned on injuring himself and then escaping from the

hospital, and had said that he would kill anyone who tried to stop him. In closing argument, the prosecutor used this incident to describe the defendant as a "cold and calculating person." No objection was made to this use of the evidence at trial, nor was it included in the post-trial motions.

The defendant acknowledges that evidence of an attempt to escape is admissible for purposes of establishing guilt of the crime charged (*People v. Yonder* (1969), 44 Ill. 2d 376, 392), but claims it was plain error to also allow into evidence that defendant planned on injuring people during the escape. We disagree. There was competent evidence that the defendant had dangerous weapons and that he acknowledged their dangerousness and would use them if necessary. It was not an error to present the facts and circumstances surrounding his attempted escape. (*People v. Gambino* (1957), 12 Ill. 2d 29, 32; *People v. Lawson* (1928), 331 Ill. 380, 393.) Clearly, we need not decide that the evidence constituted plain error.

The defendant also claims that failure to give an instruction that the jury should consider only the evidence to establish guilt was an error because during closing argument the State used the escape attempt to comment on the defendant's character. Defendant therefore argues that it is likely that the jury convicted the defendant based on his criminal propensity.

The defendant failed to tender the suggested jury instruction (Illinois Pattern Jury Instructions, Criminal, No. 3.14 (2d ed. 1981) (IPI Criminal 2d)), but argues that the trial judge should have *sua sponte* given the instruction. It is the burden of the party who desires a specific instruction to present it to the court and request that it be given to the jury. (*People v. Britz* (1988), 123 Ill. 2d 446, 475; *People v. Underwood* (1978), 72 Ill. 2d 124, 129; *People v. Parks* (1976), 65 Ill. 2d 132, 137.) Generally, the only situations where a fair trial requires the court to *sua sponte* offer an instruction include "seeing

that the jury is instructed on the elements of the crime charged, on the presumption of innocence and on the question of burden of proof." (65 Ill. 2d at 137.) The trial court did not commit error in failing to tender IPI Criminal 2d No. 3.14 because it involves none of these issues. Therefore, the defendant's failure to tender the instruction waived this objection.

The defendant *pro se* raises a number of other objections to the trial proceedings. First, he claims that the prosecutor impermissibly commented on his post-arrest right to silence. During cross-examination, the defendant denied that at trial was the first time he indicated what his defense would be, claiming he told the State nine months earlier his whereabouts on the night of July 13. The prosecutor then asked:

"Q. This is the first time that you've ever told anybody but your attorney what you were going to say here on the stand, isn't it?

A. As far as publicly, yes.

Q. You've never talked with a police officer in this case?

A. No.

Q. You are telling this jury that as of the morning you were arrested, you didn't know what you were arrested for.

A. That's true.

Q. What did you say to Officer Zirkelbach when he came in to arrest you?

A. I don't remember saying anything to Officer Zirkelbach.

Q. Isn't it a fact that when he came in and said he wanted Michael, that you said, 'Here I am. You're looking for me'?

Q. No, it is not."

The defendant claims that commenting on his silence indicated to the jury that he was making up his defense because he did not tell it to police officers after his arrest. The State argues that it was within the realm of permissible impeachment because at trial defendant was claiming innocence but at the time of the arrest his

statement was an indirect admission of guilt. (*People v. Rehbein* (1978), 74 Ill. 2d 435, 442-43; *People v. McMullin* (1985), 138 Ill. App. 3d 872, 877.) No objection was made at trial, and on review of the record, it appears that the prosecutor could have been either laying the foundation to impeach the defendant with the officer's testimony that defendant made incriminating remarks upon arrest, or he could have been trying to point out to the jury that because the defendant had never given his alibi to the police earlier, he was making one up. Though it is improper to comment on a defendant's post-arrest silence (*Doyle v. Ohio* (1976), 426 U.S. 610, 618, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245; *People v. Green* (1979), 74 Ill. 2d 444, 449), the evidence is not so closely balanced that plain error applies. Even comments which may be improper do not constitute reversible error unless they result in substantial prejudice. (*People v. Britz* (1988), 123 Ill. 2d 446, 472; *People v. Collins* (1985), 106 Ill. 2d 237, 276.) We do not believe that the error, if any, was anything more than harmless, and it did not deny the defendant a fair trial.

Defendant next contends that his sixth amendment right to counsel was denied because his attorney was not present during a photo display to Michael Cox. However, no objection to the photo showup was made at trial or in a post-trial motion. As noted in *People v. Enoch* (1988), 122 Ill. 2d 176, 186, objection must be made at each of these stages in the proceedings. Therefore, this objection is waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 190.) Nor does this rise to the level of plain error because there is no right to counsel at the photo showup. *United States v. Ash* (1973), 413 U.S. 300, 321, 37 L. Ed. 2d 619, 633, 93 S. Ct. 2568, 2579.

In a related argument, the defendant contends that he was denied a fair trial because Cox's identification was not reliable and because since the time of the original photo showup Cox had a number of occasions to see the defendant. No objection was raised at trial, though

this was included in a post-trial motion. Cox testified that he saw the defendant in Hines' car on the night of the murder. Several months before trial the defendant hired an investigator who showed Cox a number of photos. Cox identified Hines and Michael Turner, but allegedly improperly identified the defendant. Before trial, the State's Attorney showed Cox the same photos. At trial Cox properly identified the photo of the defendant. He denied that he had earlier misidentified the defendant, claiming instead that the photo he had identified to the investigator as the defendant must have since been switched with the photo of someone else. The State's Attorney remarked that the photos were placed on numbered cards and that it was possible that they may have been switched.

There were a number of other people whose testimony placed the defendant at the scene of the crime and in Hines' car. The fact that this witness' identification may have been questionable would go to the weight and credibility of his testimony (*People v. Allender* (1977), 69 Ill. 2d 38, 44), and not to the denial of a fair trial.

The defendant alleges he was denied a fair trial when the prosecutor "ripped apart" a photo display in front of the jury. In reviewing the record it does not appear that any destruction or improper handling of the evidence occurred. The prosecutor cross-examined the defendant's investigator, Mr. Schuster, in an attempt to explain Cox's misidentification of the defendant's photo. The prosecutor asked whether a photo could have fallen off the display and whether the defendant's photo and another photo looked very similar. The witness testified that the two closely resembled each other. The prosecutor then requested that he be able to remove the two pictures from the papers they were attached to and to show them to the jury. Defense counsel said he did not want them damaged and would like them left the way they were. The court noted that the pictures were not damaged and allowed counsel to show them to the jury.

The prosecutor had the court's consent and he did not "rip apart" the photos. Therefore, a new trial is not warranted on this ground.

Turner next claims that he was denied a fair trial because during cross-examination, the prosecutor questioned him regarding the fact that he had access to all of the discovery and had months to prepare a defense, the implication being that he was making up his defense. There was no objection to these questions at trial and the defendant fails to cite any authority for the proposition that the comments were improper. We fail to see what constitutional right was violated by this alleged prosecutorial misconduct, nor can we agree that it denied him a fair trial.

In Turner's last objection regarding the guilt-innocence phase of the trial, he contends that certain photos of the victim and the scene of the crime should not have been allowed into evidence because their prejudicial impact outweighed their probative value. However, we cannot determine whether the trial court abused its discretion in allowing them into evidence because he does not identify which photos were objectionable and they are not included in the record on appeal. *People v. Edwards* (1978), 74 Ill. 2d 1, 7.

The defendant's next objections relate to the second phase of the trial, the sentencing hearing, where the jury imposed the death penalty. Turner first contends that it was improper to allow into evidence, through the testimony of a police officer, the confession of a codefendant which implicated Turner. The usual rules governing the admissibility of evidence do not apply at the second phase of a sentencing hearing in a capital case. Instead, the test governing admissibility at this stage is whether the evidence is relevant and reliable. (*People v. Johnson* (1989), 128 Ill. 2d 253, 284-85; *People v. Free* (1983), 94 Ill. 2d 378, 422-23; *People v. Davis* (1983), 95 Ill. 2d 1, 37.) Hearsay testimony which meets the relevance and reliability test is admissible at this stage of a

sentencing hearing. *People v. Foster* (1987), 119 Ill. 2d 69, 98-99.

In *People v. Rogers* (1988), 123 Ill. 2d 487, 521, we extended *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056, and held that in the sentencing hearing the confessions of an accomplice which incriminate the defendant are presumptively unreliable and should not be admitted into evidence, unless sufficient indicia of reliability exist to overcome the presumption. *Rogers* required a new sentencing hearing when the jury was allowed to hear the taped confessions of two codefendants. The court found that there was a strong presumption of unreliability because it was likely that the codefendants had an opportunity to contrive their defense, the statements did not interlock with the defendant's statement or other evidence on significant aspects of the offense involving the degree of the defendant's planning and participation, and one accomplice had a significant criminal history.

In determining the reliability of Hines' confession, it is important to analyze it in light of the other testimony and evidence. There are essentially five accounts of the events on July 13, 1985. The defendant contends that early that evening he, his brother Michael, and Hines went fishing. He claims that less than an hour after arriving, Michael and Hines went into town to get some supplies. The two returned and they fished for an hour and then left again. During the time they were gone he continued to fish. Four or five hours later Hines and Michael came back and the three went home. He claims he was unaware of the murder until his arrest.

On July 18, 1985, the defendant was arrested. In his cell were a number of people, one of whom was Howard Greenlee. At the trial on June 18, 1986, Greenlee testified that he overheard conversations in which the defendant discussed the crime. According to Greenlee, the defendant said that he, Hines and Michael Turner had been smoking marijuana and drinking when they de-

cided to "get some pussy." A light was used to pull a car over to the side of the road. The defendant and Hines took the driver, a young girl, into a cornfield. In the cornfield, the girl struggled so they slapped her a number of times. The two then raped her and continued to punch her because she would not keep quiet. The defendant said he then went "nuts" and stabbed her. When the victim still tried to scream he cut her throat. Hines supposedly went back to the car after the girl had been stabbed.

Another cellmate, Harold Meyers, testified that shortly after defendant's arrest he told him the events of the evening. According to Meyers, the defendant said that the three of them came up with the idea to flash a red light and to pull a car over with a girl in it. When they spotted the victim's car, they pulled it over and Hines got out. Hines brought the girl back to their car and the brothers held her down in the backseat and threatened her with a knife. Hines and defendant then took the girl to the cornfield and Michael Turner remained by the road as a lookout. In the cornfield, Hines slapped the girl around and raped her first. The defendant then also slapped her around and had oral sex with her. The defendant stabbed the girl and told Hines to also stab her, but Hines did not stab her because he was unable to go through with the act. Hines then left and the defendant cut her throat and left. The victim made gurgling noises after defendant cut her throat.

Michael Turner, the defendant's brother, testified that he, his brother and Hines went fishing. While fishing they saw a group of people at the other end of the lake and decided to join them. Hines said that they should take the girls and if the males tried to stop them defendant should beat or stab them. As they approached, defendant swung his machete. However, before they could reach the group, the people drove away. Michael testified that it was Hines who discussed picking up some girls, though not necessarily saying they would

rape them, and that they could do it by use of a red light he had. Hines said the three could pull a car over to the side of the road by using the red light and pretending that they were police officers. Hines said that they could grab the girls and stab any guys that tried to stop them.

After they left the lake, they drove to Hines' house and retrieved the red light. The three then drove around following a number of automobiles and occasionally parking on the side of the road, looking for an appropriate car. Eventually, Hines spotted the victim, and as they followed her defendant put the light on the dash and Hines plugged it in. When Drobney stopped, Hines got out of the car and asked for her license. He returned to the car with the license and gave it to defendant, who pretended he was a police officer reading the license number into a CB radio. Michael said he wanted no part of what was going on and put his hands behind his back, acting as though he was a handcuffed prisoner. Hines then told Drobney she would have to come with them, and he took her to the car and put her in the backseat. All testimony corroborates that Michael Turner had no active part in the abduction, rape or murder.

According to Michael, they drove to a cornfield and pulled the car along the side of the road. Hines and defendant left the car, talked for a minute, and Hines then told Michael and Drobney to get out. Hines and Drobney started to walk down the road and defendant, still pretending to be an officer, pushed Michael into a gully and said to wait there. Defendant went to where Hines and Drobney were standing. The two of them held separate arms and walked her into the cornfield. Michael could hear Hines tell her to sit down and he heard some sort of a groaning sound. Both men were in the cornfield for a while and each came out and asked if Michael wanted to join them, which he declined. One time when defendant came back, he commented that Hines was crazy and he did not think Hines was serious. Defendant also said that if he was going to jail it would be for

something he had done. Defendant then returned to the cornfield and Hines came out for a moment and gave Michael a number of Drobney's items. Michael was going to stuff the things in a culvert, but Hines said to put them in the car. Hines later returned and he and Michael got in the car and turned it around. Hines yelled for defendant to come out, but he responded he would be out in a minute. Hines yelled a number of more times and they then heard a couple of "dumping noises" and a gurgling sound. Hines said to Michael that he thought the defendant knocked Drobney out. The defendant exited the cornfield with a knife in his hand.

As the three drove along, defendant was quiet, though Hines talked about the different things he had done to Drobney. They threw most of Drobney's items out of the car. They then proceeded to a gas station, where Hines paid for gas and cigarettes with money from Drobney's change purse. Michael claims that on Sunday, the defendant told him he had killed Drobney by stabbing her. He also testified that he and defendant went to Hines' home and defendant told Hines that he had stabbed her.

Daniel Hines did not testify at the sentencing hearing, but his confession was admitted through a police officer. The confession states that he and the Turner brothers went fishing. After fishing for a number of hours, they drove around for a while in his car and eventually went back to his house. At Hines' house, defendant retrieved a portable red light because the three discussed earlier that, as a joke, they could act like police and use the light to stop people in their cars. They again drove around, this time looking for a car with a girl in it. When they spotted Drobney's car they followed it, and the defendant put the red light on the dashboard and turned it on. The car pulled over to the side of the road and Hines asked for Drobney's driver's license. As he was doing this, the defendant got out of the car and approached Drobney's car. Hines went back to his car

and the defendant told her that she had to come with them. She was placed in the back of the car and Hines drove to where defendant told him to pull over. The three men got out of the car. The defendant told Drobney to get out and he walked her about 50 to 100 yards down the road. Hines caught up to them as they were walking into the cornfield.

Hines claimed that the three never discussed having sex with the girl or killing her, and he first realized "something was up" when they walked into the cornfield. Hines claimed that the defendant made her undress and he performed a number of sexual acts on her. The defendant then asked if Hines wanted to do anything to her. Hines claims that he faked having intercourse, and while doing this he saw defendant holding a 10-inch knife. Hines left the cornfield and told Michael that the defendant wanted to see him. After Michael returned, Hines went into the cornfield and told the defendant they should leave. The defendant was again having intercourse with Drobney and he told Hines to return to the car. While Hines and Michael waited at the road, they called for the defendant to leave. He heard the girl gasp for air and scream. Hines and Michael turned the car around and yelled for the defendant. Hines claimed it seemed like another 25 minutes before defendant eventually left the cornfield. During this time sounds seemed to indicate that the defendant was torturing and strangling Drobney. When the defendant left the cornfield he was carrying a number of Drobney's possessions. Defendant said that he knocked the girl out and she would be unconscious for a couple of hours. The two brothers then went through her purse and when they stopped for gas, the brothers paid for it.

The following Tuesday Michael and defendant came to Hines' house. At this time, Hines first learned that the defendant murdered the girl. Hines claimed that the defendant laughed and joked as he discussed how he did it. The defendant also said that they disposed of the

clothes they had worn on the night of the crime. Hines' confession contradicts itself as to whether or not he burned his clothes following the murder.

The State contends that the confession is sufficiently reliable because it was corroborated by other testimony. Though each account of the evening differs, we must especially scrutinize the admissibility of a codefendant's confession when, as here, it minimizes his own role and shifts greater blame to the defendant. Hines attributes numerous significant acts to the defendant, though other testimony indicated that Hines either committed the act or was at least partially responsible. According to Hines, the defendant entered Hines' house and took the red light; the defendant unexpectedly left the car and told Drobney she would have to come with them; the defendant directed Hines where to go; the defendant took her out of the car and walked her down the road to the cornfield, and, until this point, Hines had no idea what was going on; the defendant did all the acts of physical and sexual abuse, other than the one time that Hines faked intercourse; the defendant took personal items from Drobney and put them in the car; the defendant and Michael stole her money; and Hines had no idea she was murdered until the defendant laughed and joked about what he did. Based on Hines' testimony, it is likely that the jury believed defendant was the ringleader and main actor, even though Michael claimed that none of the acts would have occurred if it were not for Hines.

Hines' account is significantly different from other accounts in important ways and, as in *People v. Rogers* (1988), 123 Ill. 2d 487, it limits his own role while shifting blame to the defendant. Hines' confession fails to make any reference to the events at the lake when he discussed abducting girls they saw nearby and he told the defendant to beat or stab the males if they tried to stop them. Hines claimed that the idea of using a light to stop people was meant as a joke. Yet, it is difficult to believe that he had no idea that the three planned to ab-

duct a girl. Other testimony indicated that all evening they planned to get a girl by using the light to pull her car over, and, according to Michael, they spent a long time driving around and parking before they found a car with one girl in it. Nevertheless, Hines' confession stated he had no idea that anything was up until they brought Drobney into the cornfield. It also seems unlikely that all Hines did was once fake intercourse and that he did not participate in the physical assault, or that he had no idea of the harm done to her until days later. Because Hines did not testify, the defense was unable to cross-examine him on these differences, inconsistencies, and things he left out.

We do not believe that there are sufficient indicia of reliability to overcome the presumption that the codefendant's confession is unreliable. This confession should not have been admitted, and the case should be remanded to the circuit court of Macoupin County so that the second phase of the sentencing hearing can be conducted anew.

The defendant raises a number of other objections concerning his sentencing hearing, but because we have determined that there will be a new hearing it is only necessary to address those issues which might appear again at the hearing.

There are a number of challenges to the constitutionality of our death penalty statute, which this court has previously resolved. Due process does not require that the State prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude imposition of the death penalty. (*People v. Johnson* (1987), 119 Ill. 2d 119, 151; *People v. King* (1986), 109 Ill. 2d 514, 546.) There is no impermissible burden of proof placed upon the defendant to establish mitigating factors. (*People v. Orange* (1988), 121 Ill. 2d 364, 390; *People v. Whitehead* (1987), 116 Ill. 2d 425, 465.) Nor is the statute arbitrary or capricious in its application. *People v.*

*Johnson* (1987), 119 Ill. 2d 119, 151; *People v. Kubat* (1983), 94 Ill. 2d 437, 503-04.

The defendant also objects to certain jury instructions. We affirm our decisions that it is not improper to instruct the jury that neither sympathy nor prejudice should influence the jury. (*People v. Crews* (1988), 122 Ill. 2d 266, 291-93; *People v. Orange* (1988), 121 Ill. 2d 364, 391.) Next, he contends that an instruction should be given that if not sentenced to death, he will receive either a life sentence or a fixed term and will have no chance for parole. In *People v. Albanese* (1984), 102 Ill. 2d 54, we held that it was not an error for the trial judge to instruct the jury that the alternative to death would be a prison term, but not specifying that the term was life imprisonment. We reasoned that "the jury was only responsible for choosing whether the death penalty was applicable, not the severity of a prison sentence should the death penalty be found to be inappropriate." 102 Ill. 2d at 81; see also *People v. Stewart* (1984), 105 Ill. 2d 22, 71.

The defendant relies on *King v. Lynaugh* (5th Cir. 1987), 828 F.2d 257, where the court reasoned that in a capital case, during *voir dire*, the defendant may inquire into preconceptions about parole laws which may bias venire members in favor of imposing the death penalty. Recently, this court applied the *King* decision to the sentencing stage. (*People v. Gacho* (1988), 122 Ill. 2d 221, 261.) In *Gacho*, the defendant was convicted of multiple murders. The court instructed the jury that if they found sufficient mitigating factors to preclude imposition of death, the judge would sentence him to imprisonment. The judge refused the defendant's instruction that the only alternative to death would be a life sentence, though he allowed the defendant to argue that in closing argument. We held that "[a]n instruction in the case of multiple murders should state that if the jury finds mitigating factors sufficient to preclude imposition of the death penalty, the defendant will be sentenced to natural

life imprisonment, and no person serving a term of natural life imprisonment can be paroled or released, except through executive clemency." 122 Ill. 2d at 262.

*Gacho* was limited to the case of multiple murders where the only sentencing choices were death or life imprisonment. In this case there was also the possibility of a fixed-term sentence of an indeterminate time. We decline to depart from the rationale of *Albanese* and *Stewart* that in such situation the jury's concern should be directed at whether death is appropriate, and not the alternative sentencing choices which are, at that point, undeterminable.

Turner next contends that the convictions for the noncapital offenses should be vacated because they involve lesser included offenses. The State responds that the issue is waived by the failure to raise it in a motion for a new trial. Under the plain error doctrine, we may review a claim of multiple convictions in which one crime is a lesser included offense of another. *People v. Dyer* (1977), 47 Ill. App. 3d 63; *People v. Casner* (1974), 20 Ill. App. 3d 107, 112.

The jury convicted the defendant of criminal sexual assault and of aggravated criminal sexual assault. A charge of criminal sexual assault requires proof of sexual penetration by the use or threat of force. (Ill. Rev. Stat. 1985, ch. 38, par. 12—13(a)(1).) Aggravated criminal sexual assault requires proof of penetration by force and the display, threat of use or the actual use of a dangerous weapon, or bodily harm to the victim. (Ill. Rev. Stat. 1985, ch. 38, pars. 12—14(a)(1), (a)(2).) The State argues that numerous sexual acts occurred, some of which were criminal sexual assault and others of which were aggravated criminal sexual assault, and that the defendant was guilty of the acts he committed and, through accountability, of the acts that Hines committed. Turner argues that, by definition, criminal sexual assault is a lesser included offense of aggravated criminal sexual assault and the jury instruction did not require the consideration of separate

acts, nor did the prosecution argue that the jury had to find separate acts to support each offense.

The defendant's argument must be rejected. Pursuant to the doctrine of *People v. King* (1977), 66 Ill. 2d 551:

> "Prejudice results to the defendant only in those instances where more than one offense is carved from the same physical act. Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense. We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." (66 Ill. 2d at 566.)

From the evidence presented, it is reasonable to conclude that both Hines and the defendant committed numerous criminal sexual assaults. Further, after at least one such act was completed, the defendant pulled out a "dangerous weapon," his knife, and further acts of sexual penetration occurred. There is thus no prejudice to this defendant to be convicted for multiple offenses resulting from his various acts. There were numerous sexual assaults, physical harm was inflicted and a dangerous weapon was used. "To the victim, each rape was 'readily divisible and intensely personal; each offense is an offense against a person.' " (Emphasis omitted.) (*People v. Segara* (1988), 126 Ill. 2d 70, 77, quoting *Pruitt v. State* (1978), 269 Ind. 559, 565, 382 N.E.2d 150, 154.) Further, under these facts, the jury could have found the defendant guilty of the one count of aggravated criminal sexual assault based on his actions and, under our accountability statute (Ill. Rev. Stat. 1985, ch. 38, par. 5—1 *et seq.*), found him guilty of the criminal sexual assault Hines

committed. Therefore, both the aggravated criminal sexual assault and criminal sexual assault convictions must stand.

Turner next contends that the convictions for unlawful restraint and kidnapping cannot stand because they are lesser included offenses of aggravated kidnapping. Unlawful restraint occurs when the defendant knowingly and without legal authority detains another person. (Ill. Rev. Stat. 1985, ch. 38, par. 10—3(a).) Kidnapping occurs when the defendant knowingly and secretly confines another person against her will, or by deceit or enticement induces another person to go from one place to another place with intent to secretly confine that person against her will. (Ill. Rev. Stat. 1985, ch. 38, par. 10—1(a).) Aggravated kidnapping occurs when there is a kidnapping and the defendant inflicts either great bodily harm, criminal sexual assault, robbery, or aggravated criminal sexual assault upon the victim. Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a).

The State argues that there were sufficient intervening occurrences which establish separate acts, permitting the multiple convictions. It argues that the kidnapping occurred when the victim was stopped, placed in the defendant's car and brought to the cornfield. The kidnapping then ended when the three men got out of the car and she remained inside. The unlawful restraint occurred when the victim was taken out of the car and brought to the cornfield. Presumably, the aggravated kidnapping occurred in the cornfield. We do not accept the State's interpretation of the events. There was one ongoing event and it is sufficient to sustain a charge of aggravated kidnapping. (*People v. Kittle* (1986), 140 Ill. App. 3d 951, 957; *People v. Tate* (1981), 94 Ill. App. 3d 192, 200.) Therefore, the convictions for kidnapping and unlawful restraint are vacated.

Defendant last contends that there should be a new sentencing hearing for the noncapital offenses because it was improper to allow the jury to hear the victim impact

statement which the victim's parents had prepared. Defendant claims that the record does not establish that the statement was prepared in conjunction with the office of the State's Attorney, as required by statute (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—4—1(a)(6), 1406), and that any such statement violates his eighth amendment and due process rights (*Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529).

*Booth* held that introduction of victim impact evidence was constitutionally impermissible where imposition of the death penalty was at issue. The Supreme Court was explicit in limiting its ruling to capital cases, and we decline to extend this principle to a noncapital sentencing hearing. In *Booth*, the Court stated that "[w]hile the full range of foreseeable consequences of a defendant's actions may be relevant in other criminal and civil contexts, we cannot agree that it is relevant in the unique circumstance of a capital sentencing hearing." (482 U.S. at 504, 96 L. Ed. 2d at 449, 107 S. Ct. at 2533.) It then went on to note that "[o]ur disapproval of victim impact statements at the sentencing phase of a capital case does not mean, however, that this type of information will never be relevant in any context. *** Facts about the victim and family also may be relevant in a noncapital criminal trial." (482 U.S. at 507 n.10, 96 L. Ed. 2d at 451 n.10, 107 S. Ct. at 2535 n.10.) We hold that allowing this statement at the noncapital sentencing hearing did not violate the defendant's constitutional rights. In light of the strong evidence of guilt, we find that the error in the admission of this evidence was not reversible.

The convictions and sentences for aggravated criminal sexual assault, criminal sexual assault, and aggravated kidnapping are affirmed. The convictions and sentences for kidnapping and unlawful restraint are vacated. The conviction for murder is affirmed. However, the sentence of death for murder is vacated and the cause is remanded to the circuit court of Macoupin

County for a new sentencing hearing on the conviction of murder.

*Affirmed in part; vacated in part;*
*death sentence vacated;*
*cause remanded.*

WARD and CALVO, JJ., took no part in the consideration or decision of this case.

JUSTICE MILLER, concurring in part and dissenting in part:

I concur in the court's disposition of the defendant's convictions. I do not agree, however, that a new sentencing hearing is necessary in this case, for I do not believe that error occurred in the introduction of testimony relating the accomplice's confession at the second stage of the capital sentencing hearing. Accordingly, I dissent from that portion of the majority opinion.

The majority believes that the confession of accomplice Daniel Hines was insufficiently reliable to warrant its admission into evidence as part of the State's case in aggravation during the second phase of the sentencing hearing. As the majority opinion details, the jury heard five separate accounts of the events that led to the tragic death of the victim in this case. Testifying in the State's behalf at trial were the defendant's brother, Michael Turner, and two cellmates of the defendant, Howard Greenlee and Harold Meyers. Michael Turner was with the defendant and Hines when the victim was kidnapped, and he provided a detailed description of the events preceding and following the victim's murder. Michael Turner was not present when the defendant committed the murder, however, and evidence of what occurred during that time was provided by Meyers and Greenlee, who testified to certain inculpatory statements made by the defendant while he was in the Macoupin County jail awaiting trial on the instant charges. The defendant testified at trial, and he denied all complicity in the victim's kidnapping, sexual assault, and murder.

Finally, during the second phase of the defendant's capital sentencing hearing, the State presented Hines' confession, which was read to the jury by a law enforcement officer.

The rules of trial evidence do not govern the second phase of a death penalty hearing. Subject to the demands of due process (see *Gardner v. Florida* (1977), 430 U.S. 349, 51 L. Ed. 2d 393, 97 S. Ct. 1197), the only requirements limiting the introduction of evidence at that stage of the proceedings are that the information be relevant and reliable. (See Ill. Rev. Stat. 1987, ch. 38, par. 9—1(e); *People v. Free* (1983), 94 Ill. 2d 378, 422-23.) That determination "rests in the discretion of the trial court." (*People v. Hall* (1986), 114 Ill. 2d 376, 416-17.) Hearsay testimony that does not fit within a recognized exception to the hearsay rule is not automatically rendered inadmissible at the latter stage of a bifurcated capital sentencing hearing, nor does its introduction necessarily deny a defendant the right to confront witnesses. (*People v. Perez* (1985), 108 Ill. 2d 70, 86.) Consistent with those principles, this court has held that the introduction, at the second stage of a capital sentencing hearing, of hearsay evidence concerning statements by nontestifying accomplices does not violate a defendant's confrontation rights. (*People v. Lyles* (1985), 106 Ill. 2d 373, 414-16; *People v. Davis* (1983), 95 Ill. 2d 1, 47.) I would hold that the requirements were satisfied in this case with respect to Hines' confession.

In his confession, Hines denied having an active part in the planning of the offenses, and he stated that he was not present when the defendant committed the murder. Although it appears that Hines' account of his own role in the victim's kidnapping was different from the accounts provided by Michael Turner, Howard Greenlee, and Harold Meyers, Hines' statements regarding his absence from the scene during the defendant's murder of the victim were substantially corroborated by the testimony of those other witnesses. Michael Turner testified

that he and Hines were waiting at the car while the defendant remained in the field with the victim. They were able to hear sounds from the field, and sometime later the defendant returned to the car. Michael Turner testified that he did not learn of the victim's murder until the next day, when the defendant told Michael what he had done. The defendant said that he driven the knife through the victim's neck twice, using the palm of his hand. Michael Turner also testified that the defendant told Hines about the murder several days later; on that occasion the defendant repeated the explanation he had previously given to Michael Turner regarding the victim's murder. The defendant's account of the murder was confirmed by the autoptic evidence introduced at trial, which established that the cause of the victim's death was two stab wounds to the neck.

I would distinguish the instant case from *People v. Rogers* (1988), 123 Ill. 2d 487, on which the majority places principal reliance. In *Rogers* the prosecution was permitted to introduce into evidence at the second stage of a death penalty hearing confessions made by two accomplices, whose statements conflicted with the defendant's own confession in several important respects. The accomplices maintained in their confessions that the plan to rob and kill the victim in that case had originated with the defendant, and they claimed that they had attempted to discourage the defendant from committing the offenses. The defendant, in his confession, stated that one of the accomplices had instructed him to kill the victim while committing the robbery. Tape recordings of the accomplices' confessions were played to the jury during the second stage of the defendant's death penalty hearing; the prosecutor argued that the most serious circumstance in aggravation was the cold-blooded planning that had preceded the crimes, and he presented the accomplice confessions as evidence of who had been the motivating force in the commission of the offenses.

Citing *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056, the court in *Rogers* noted that accomplice confessions incriminating a defendant are presumptively unreliable, and the court characterized as "particularly strong" the presumptive unreliability of the two confessions introduced at defendant Rogers' sentencing hearing. (*Rogers*, 123 Ill. 2d at 521.) It appeared that the two accomplices, a male and a female who were romantically involved at the time, would have anticipated their impending arrest in connection with the offenses and therefore could have made advance preparations for their interrogations. Moreover, we noted that the male accomplice "extraordinarily claim[ed]" in his statement to the police that although he had supplied the defendant with the murder weapon several days before the crimes and accompanied the defendant when the offenses occurred, he attempted to discourage the defendant from committing the crimes. (*Rogers*, 123 Ill. 2d at 522.) *Rogers* also referred to the prosecutor's explanation at the sentencing hearing that he was presenting a tape recording of the statement, rather than the accomplice's live testimony, because of the witness' poor demeanor. We stated, "Essentially, the prosecutor was apparently concerned that the jury might not believe [the male accomplice] if they could see him testify." (*Rogers*, 123 Ill. 2d at 522.) The court concluded that the presumption of unreliability had not been overcome with respect to either accomplice's confession and therefore ruled that the circuit judge had erred in admitting the hearsay statements.

The accomplice confession in this case is not similarly unreliable. Although Hines' claim that he was not aware of what the defendant intended to do to the victim until the group reached the cornfield was contradicted by the State's other evidence, Hines' assertions that he was not present during the murder and was not immediately aware of the murder were substantially corroborated. The trial testimony of Michael Turner, Greenlee, and

Meyers established that the defendant was alone when he committed the murder and that Hines was with Michael Turner at the car during that period. Contrary to the majority's view, Hines' portrayal of the defendant as "the ringleader and main actor" in the commission of the crimes (128 Ill. 2d at 572) is not an inaccurate summary of what occurred. Accordingly, I do not believe that error occurred in the introduction, at the second stage of the defendant's capital sentencing hearing, of the testimony relating Hines' confession, and I would uphold the trial judge's decision to permit the jury to hear that information.