THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
FERNANDO HERRERA, Defendant-Appellant.

First District (6th Division)    No. 1—92—1238

Opinion filed January 7, 1994.

Mark W. Solock and Barry A. Spector, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Marci Lubin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GIANNIS delivered the opinion of the court:

Following a jury trial, defendant was convicted of one count of first degree murder and was sentenced to a term of 27 years. Defendant appeals his conviction, contending that (1) the State presented insufficient evidence to prove him guilty beyond a reasonable doubt, (2) the trial court committed reversible error by restricting defendant's right to cross-examine witnesses, and (3) he was deprived of the right to a fair trial by certain inflammatory and prejudicial comments made by the prosecutor during closing argument.

The record reveals that defendant was charged on April 30, 1991, with one count of armed violence and with two counts of murder in connection with the death of Enrique SiFuentes on November 22, 1985.

At trial, Francisco Lopez testified that he was 23 years old and was 16 years old on November 22, 1985, the date of the shooting of Enrique SiFuentes. On the night of the shooting, Lopez was at home with SiFuentes, who was then 15 years old. At approximately 11 p.m., Adrian Hernandez, who was then 18 years old, arrived at Lopez's home. Shortly after Hernandez arrived, all three individuals went out to eat at a taco restaurant located on the northeast corner of Blue Island and Damen. After they finished eating, Lopez walked out of the restaurant first, followed by SiFuentes, and Hernandez stayed in the restaurant in order to pay the bill. As Lopez walked out of the restaurant, he was looking eastbound on Blue Island and noticed two cars approaching the intersection very slowly. A gray car was traveling in the lane closest to the sidewalk while a black car was traveling in the middle lane behind the gray car. Both cars had black windows. The front window on the passenger side of the gray car was rolled down, and Lopez saw an individual waving his hand as if making gang signals. These hand signals formed the letters "V" and "L." The black car in the middle lane moved ahead of the gray car, and Lopez noticed another person sticking his hand out of the front passenger's window of the black car. After Lopez turned around and told his friends to look at the cars, he then heard two shots. Upon hearing the shots, Lopez turned to face the cars. Lopez testified that the shots came from the black car which was in the middle lane.

Both cars then drove away. SiFuentes had been shot in the right temple and did not respond when Lopez called out to him. Lopez and Hernandez then ran one block to a police station. When they returned to the scene with the police, the two cars were gone.

Lopez testified that he had never been in a gang. He did not know if SiFuentes or Hernandez was ever in a gang. At the time of trial, Hernandez was deceased.

On cross-examination, Lopez testified that there seemed to be two people in the gray car and four people in the black car. Lopez stated that the incident happened very quickly, and he could not identify the person who had fired the shots. Lopez could not identify defendant at trial as one of the individuals in either of the two cars. Lopez also viewed a lineup in March 1991, 10 months prior to trial, but he could not tell if defendant was present in the lineup.

After Lopez was excused, the prosecutor made an oral motion *in limine* to exclude any evidence that the gun which was used in the shooting of SiFuentes might also have been used in two other shootings later that same night. In response, defense counsel argued as follows:

> "I think that if the witness takes the stand and testifies to certain events that happened that evening and indicates that someone else is the shooter, and he then gives a statement to the police in effect telling his role in this case and in two others that happened that very evening, in fact with the same .22-caliber that was alleged to have been used in this case, that I certainly should be able to ask that witness what he said to the police about those two other shootings and his involvement in two other shootings. That goes to his credibility and goes to the jury's opinion of that witness and his credibility. And what he has done and what he's admitted to doing on that same evening with that same weapon."

The trial court reserved its ruling on the State's motion *in limine* until after Arturo Cardona had testified on direct.

Arturo Cardona testified that he was 27 years old and had been employed for three years at a foundry, where he worked to support his wife and child.

Cardona testified that in November 1985, he owned a gray 1978 Pontiac Catalina. Cardona identified defendant at trial and stated that at the time of the shooting, both he and defendant were members of the Villa Lobo street gang. At approximately 10 p.m. on November 22, 1985, Cardona was at a bar with defendant. Other members of the Villa Lobo street gang who were also present in the bar that night included Antonio Ascencio, Gabriel Baez, David Bege, and Ramon Bege. The bar was located in the vicinity of Blue Island and

18th Street. As he and his companions left the bar, Cardona saw Baez give a .22-caliber, long-barrel revolver to defendant, who put the gun in the waistband of his pants.

Defendant got into Cardona's car along with David and Ramon Bege. Cardona was driving, and defendant was in the front passenger seat while David and Ramon Bege rode in the back seat. Baez also left the bar and got into his gray Impala with Ascencio. After leaving the bar, both cars drove to Blue Island toward defendant's garage, which as located at 2318 South Ridgeway. As they approached the intersection of Damen and Blue Island where the taco restaurant was located, the traffic light was red, and both cars slowed down. Cardona's car was in the middle lane of traffic, and Baez's car was in the lane closest to the curb where the restaurant was located. When the two cars stopped for the red light, Cardona's car, which was in the middle lane, was approximately one-half car length in front of Baez's car.

Before the traffic light turned green, Baez beeped his horn, and Cardona noticed three kids coming out of the restaurant. The kids did not have gang colors on. When the light turned green, Cardona saw Baez point at the kids who had come out of the restaurant. As he pulled away from the intersection, Cardona felt some cold air and heard a shot coming from his right side, where defendant was sitting at the time. Cardona then heard defendant say, "I think I got one." Cardona did not reply, but continued driving west on Blue Island, as did Baez. Cardona testified that after he heard the shot, he did not see the gun in defendant's hand. When they arrived at defendant's garage, defendant got out of the car, and Cardona drove home. Cardona testified that he did not see anyone else with a gun that night, and he had no prior knowledge that defendant intended to shoot SiFuentes.

Cardona testified that on the evening of December 29, 1985, five weeks after the shooting, he was brought to the Area 4 violent crimes headquarters and was questioned about the shooting. Cardona testified that, because he was frightened, he told the police that the shot that killed SiFuentes had been fired from Baez's car. At approximately 9 a.m. on the morning of December 30, 1985, Cardona spoke with the police again after they told him that another witness had implicated him in the shooting.

Cardona stated that he was testifying under a court-ordered subpoena and that he had not been involved in gang activity since the shooting of SiFuentes. Cardona stated that in 1984, after having pled guilty to arson of a car, he paid restitution and received a sentence of probation.

In response to the prosecutor's question, Cardona acknowledged that he testified at his own trial on January 5, 1987, that he saw defendant holding a gun in his hand which was sticking out of the window in Cardona's car.

On cross-examination, Cardona denied that he owned a black four-door LTD, and stated that his car was gray and had two doors. Cardona stated that prior to the shooting, he had been in the bar for about 30 minutes, playing pool and drinking four to five beers. Baez left the bar about 10 minutes after Cardona and defendant.

When asked about his first conversation with the police, Cardona testified that he told the police that Ascencio was in the front seat of Baez's car and that he did not see anyone in the back seat. Cardona admitted that he lied to the police the first time he talked to them. In that first conversation, Cardona did not say that defendant had shot anyone, and he did not tell the police that he had heard defendant say, "I think I got one." Rather, Cardona told the police that the shots came from Baez's car. When he told the police this, he did not know anything about Ascencio being at the station.

Cardona stated on cross-examination that he heard a shot and felt cold air, but he did not see a gun in defendant's hand after the shot was fired. Cardona did not know what happened to the gun that Baez gave defendant in the bar, and he never saw the gun again after they left the bar. Cardona denied that he saw defendant fire a gun out of his car. Cardona was in the police station all night and slept in a chair during the period between his first conversation on the evening of December 29, 1985, and his second conversation at approximately 9 a.m. on December 30, 1985. Between the two interviews the detectives told him that Ascencio had implicated him by stating that Cardona's car was involved. Thereafter, Cardona told the police that the shot did come from his car. Cardona testified that when he spoke to the police the second time, he was still scared because he was being blamed for being involved in the murder.

Cardona stated that he was tried for SiFuentes' murder and found not guilty. Cardona denied testifying at his own trial that he saw defendant do the shooting. He testified further that he was no longer a member of the Villa Lobo street gang, and he had no allegiance or obligation to the Villa Lobo street gang or to defendant.

On redirect examination, Cardona stated that, at his own trial, he testified that after defendant shot the gun, Cardona turned around and heard defendant say, "I think I got one." Cardona testified that he drove approximately a quarter of a block before defendant made this statement. Cardona did not respond, and he did not see the gun or anyone shot. Cardona also denied knowing whom defendant had

shot. Cardona stated that, at his own trial, he testified that he saw defendant with a gun in his hand after he felt cold air coming from the right front window. Cardona testified at defendant's trial that he was confused when he was asked those questions at his own trial. Cardona acknowledged that at his own trial, he testified that defendant fired a gun twice out of the car window. He also admitted that he gave a written statement on December 31, 1985, in which he said that he saw defendant pull his hand from his side, roll down the window, point the gun toward three individuals in front of the restaurant, and fire once.

Cardona testified that he had hired a lawyer to represent him so that he would not have to testify at defendant's trial because he was afraid.

On re-cross-examination, Cardona testified that at the time he gave the written statement, he was confused, and he knew that some of it was not true. The part of the statement which was not true was that portion in which he indicated that he saw defendant pull out the gun, roll down the window, and point the gun at three people.

Cardona stated that on the night of the shooting, he saw Baez pointing in the other car which was closer to the curb and a little bit behind Cardona's car. Cardona could not tell what Baez was pointing with. Cardona testified that he could not say for sure that the gunshot came from inside his car.

Although the trial court had reserved the ruling on the State's motion *in limine* until after Cardona testified on direct, this witness completed his testimony and was excused without the court rendering its decision on this motion.

The State then called Antonio Ascencio, who stated that he was serving a three-year sentence after having pled guilty to a charge of possession of a stolen motor vehicle. He also admitted that he had a prior felony conviction for possession of a stolen motor vehicle for which he had received probation.

Ascencio testified that on November 22, 1985, he was 15 years old and was a member of the Villa Lobo street gang. At approximately 11 p.m., he went to a bar located at 18th Street and Wolcott in Chicago. Ascencio was accompanied by Baez, David and Ramon Bege, Cardona, and defendant. All of Ascencio's companions at the bar were members of the Villa Lobo gang. According to Ascencio, defendant had a .22-caliber, long-barrel revolver while he was in the bar, and Ascencio saw defendant take the gun from his waistband and put it into his coat pocket. After a while, the group left the bar, and Ascencio left with Baez in Baez's gray Impala. Defendant was in Cardona's gray Pontiac Catalina along with Cardona, David Bege, and Ramon Bege. Defendant got in the front passenger seat.

After driving for awhile, the two cars arrived at the intersection of Blue Island and Damen where a taco restaurant was located. Baez's car was near the curb, and Cardona's car was in the middle lane, approximately one-half car length ahead of Baez's car. In front of the taco stand, a group of three or five Latino males started to display Disciples gang signals to them. Ascencio responded by displaying the Villa Lobo street gang signal. Baez then beeped his horn to Cardona. Cardona looked out of the window and said, "What's up?" Baez pointed to the guys in front of the taco stand. Defendant then stuck out his hand and started shooting with the gun Ascencio had seen earlier in the bar. Defendant fired the gun two or three times. He was pointing the gun in the direction of the guys standing in front of the taco stand. Nothing obstructed Ascencio's view of the shooting, and he saw the gun in defendant's hand. Both cars then drove off to a bar located at St. Louis and 26th Street. When they arrived at this second bar, David Bege had the gun.

On December 28, 1985, Ascencio spoke with the police, but he lied and denied knowing anything about the shooting. The following day, Ascencio again spoke with the police after being informed that Ramon Bege had made a statement to the police. Ascencio then told the police "the truth" about what had happened on November 22, 1985. Ascencio testified that there were no agreements made between him and the prosecutor for his testimony in the case.

On cross-examination, Ascencio stated that when he was at the police station, the detectives did not tell him what Ramon Bege had said, but they put him in front of Bege. Ascencio did not recall whether he told the detectives in his second statement that, after the shooting, he asked Ramon Bege what had happened. After they came out of the second bar, the gun was in the possession of David Bege, who announced that he had the gun. Ascencio did not see the gun pass from defendant to David Bege. Baez, Ramon Bege, David Bege, and Ascencio all got in the car together after coming out of the second bar. They then went to 27th and Pulaski, and Bege had the gun at that time. Ascencio was at the first bar for two or three hours and had consumed a couple of beers.

During the cross-examination of Ascencio, defense counsel sought to question him about the location of the gun after SiFuentes was shot and about the two shootings that occurred in the hours after SiFuentes was killed. The prosecutor objected and, in effect, renewed the prior motion *in limine* based upon relevancy. During a side-bar discussion, defense counsel argued as follows:

"I think at this point in time it is strongly probative and strongly [relevant]. And it is a question for the jury and not for

the Court to decide who had that gun at the important time on the corner of Damen and Blue Island. Because this witness said he never saw it passed. And he doesn't recall seeing it passed. So, again indicate [ sic] there's two other—

\* \* \*

I would indicate I believe the fact that he is blaming two other people for doing two other shootings that evening. He's blaming my client for doing the shooting at Damen and Blue Island, is indicative of a witness who is concealing his own involvement in shootings and blaming—constantly blaming others. And that's a question I wanted to argue. And I believe that it's probative of someone other than this defendant doing the shooting. The fact that two other shootings were done with the same gun and the gun was in the possession of other people at a later time unexplained [sic] how it was passed."

After the side-bar discussion, the trial court granted the State's motion *in limine*, stating that defense counsel was "precluded from asking questions about the two other shootings that took place."

On redirect examination, Ascencio testified that on January 25, 1987, he had testified in another proceeding that defendant had shot SiFuentes.

Chicago police officer William Soraghan testified that he was assigned to the 10th district tactical unit specializing in street gangs. Soraghan was assigned to investigate the shooting of SiFuentes. After speaking with Ascencio on December 30, 1985, Soraghan began to look for defendant. Soraghan explained that he was unsuccessful in his repeated attempts to locate defendant through street informants and through surveillance of defendant's home and gang hangouts. A murder warrant was issued against defendant on January 13, 1986, approximately seven weeks after the shooting. Although Soraghan had tried to locate defendant, he had been unable to find him from December 30, 1985, to March 20, 1991. Soraghan did not write any reports regarding his attempts to locate defendant, and he never investigated defendant's workplaces. On March 20, 1991, Soraghan received a tip which led to defendant's arrest while he was a passenger in his mother's car as they pulled up in front of the house. Soraghan testified that when he finally found defendant, defendant did not resist arrest and had no opportunity to run away.

The State also called Dr. Barry Lifschultz, who testified that he worked for the Cook County medical examiner's office and he performed an autopsy on Enrique SiFuentes on November 23, 1985. According to Lifschultz, SiFuentes' body had a single gunshot wound to the right side of the head. A small caliber lead bullet was recovered from the left back of his head. SiFuentes died as a result of a gunshot

wound in the head. The recovered bullet was photographed, packaged, and turned over to the Chicago crime lab.

The parties stipulated that, if called as a witness, firearms examiner Robert Smith would testify that he had examined the bullet recovered from the head of the victim and concluded that it was a .22-caliber bullet. Because the bullet was in such bad shape, it could not be compared to any gun.

Defendant presented a stipulation that, if called as a defense witness, Francisco Lopez would testify that he told the police that he believed the shots which killed SiFuentes came from a black Ford LTD four-door vehicle, but he could not be sure.

The defendant then called his first alibi witness, Sylvia Garza, who testified that she had known defendant for seven years. Ms. Garza stated further that at approximately 8:30 p.m. on November 22, 1985, she saw defendant and an individual named Jova (Valentine) at a bar in the area of Cullerton and Paulina. There were many men in the bar playing pool, and Garza recognized Gabriel Baez. Ms. Garza and David Roman purchased a six-pack of beer and then left the bar along with defendant and Jova. The group then went to Garza's house at 20th Street and Campbell, where they all stayed until 5 a.m. the next morning. Garza took defendant home at approximately 5 a.m. Outside defendant's house, they met defendant's mother, who was waiting for a ride.

Garza testified that she met defendant's mother approximately one month later and said that she could help because she remembered that defendant was with her on the night of the shooting. Garza said that she remembered the date because it was a week before Thanksgiving.

On cross-examination, Garza testified that she lived with David Roman and that she came to court with Roman's wife. Garza said she had spoken with Roman, defense counsel, and with defendant before testifying. Garza denied being a member of a street gang, but stated that Roman and defendant were members of the Villa Lobo street gang in 1985. Garza testified that she remembered the date of the offense, which was about seven years ago, because she always went drinking on the weekend before Thanksgiving, but Garza could not recall on what day of the week November 22, 1985, fell. Garza could not identify or describe the bar she and defendant had gone to on the night of the shooting. When asked about her activities on the Friday before Thanksgiving 1986, Garza stated that she was with her family because her mother had been in the hospital.

Garza testified further that between the years 1986 and 1988, she saw defendant on an occasional basis. When the prosecutor inquired

into her activities on the Friday night before Thanksgiving in 1985 (the day of the shooting), Garza testified that she stayed home. She stated further that she was at home with David Roman and her children on the following night.

Defendant then called David Roman, whose description of the events of November 22, 1985, was substantially the same as that presented by Garza. Roman admitted that he had pled guilty to a misdemeanor charge of unlawful use of a weapon and received a one-year term of probation in 1983.

On cross-examination, Roman testified that he was interviewed by the two prosecuting attorneys on the night before his testimony. Also present during this interview was a sheriff's policeman and a Chicago police detective. Roman stated that he did not know on what day of the week November 22, 1985, fell, and he did not remember what he did on the Friday or the Saturday before Thanksgiving of that year. Roman testified that it was not unusual for him and some friends to go out for a few beers. At the time of trial, Roman was 34 years old and had been going out for a few beers with friends for close to 17 years.

In 1985, Roman saw defendant on a regular basis. He was not sure if he saw defendant in January of 1986. He did not know where defendant went, and he did not know where defendant was in 1987. Roman was not sure whether he saw defendant in 1987.

Roman was then questioned about his conversation with the prosecuting attorneys on the evening before he was called to testify at defendant's trial. Roman testified that during the interview the previous evening, the prosecutor inquired as to whether defendant was in Mexico in 1986 and in 1987, and Roman had replied that he did not know. Roman testified that he was not sure whether the prosecutor had asked him if defendant went to Mexico. Roman then stated that he probably saw defendant in 1986, but he was not sure when. Roman indicated that he had learned of the shooting when defendant's mother asked him about it approximately one month after it occurred. When asked whether he told the prosecutor the previous evening that defendant came to him last March and asked if Roman remembered being with defendant in November 1985, Roman testified that defendant's mother had asked him about it first, and then defendant asked about it later.

On rebuttal, the State called Chicago police detective Norphy Diciolla, who testified that he was present along with sheriff's police officer John Gallagher at 7 p.m. on January 9, 1992, when David Roman was interviewed by the two prosecuting attorneys. During that interview, the prosecutor asked Roman whether or not he knew

that defendant had fled to Mexico in November 1986 and 1987, and Roman replied that he did. Roman stated during this interview that he had been told by some members of defendant's family that defendant was wanted in the neighborhood and had gone away for two or three years. According to Diciolla, Roman stated further that he found out about the date of the shooting shortly after defendant's arrest in March 1991. Roman did not say anything to Diciolla or the prosecutors about a conversation with defendant's mother. Diciolla testified that Roman also did not mention that on the night of November 22, 1985, he went to a bar on Cullerton with defendant and another individual named Valentino. Diciolla testified further that Roman did not tell the prosecutors that he, defendant, Garza, and Valentino were drinking in Roman's apartment on Campbell on November 22, 1985. Roman never indicated that the group went to a tavern.

On cross-examination, Diciolla acknowledged that he did not take notes or write anything down during the interview with Roman, and he did not see anyone else do so. Diciolla stated that the conversation with Roman was very short, lasting only two or three minutes, and was not detailed enough to take written notes.

During closing arguments, defense counsel specifically commented upon the assertion that Cardona and Ascencio were afraid. Defense counsel argued the following:

"[Cardona and Ascencio] are afraid they can be charged with perjury and go to jail for that *** They were afraid back then of being charged [with the shooting] themselves.

\* \* \*

[Cardona] is afraid of my client. Again I didn't see that. *** I do not believe that the *** demeanor of Ascencio showed that he is afraid of anybody. *** You can look in his eyes and see whether or not he was afraid of my client."

In rebuttal, the prosecutor responded by arguing:

"You saw the eyes of [Cardona] at the end of his testimony, and you saw the tears. *** [Cardona] was scared to death because *** when he is testifying that this guy is in the car where the shooting came from, he had got the eyes of death staring him down, *** he is afraid *** because he knows what [defendant] can do because he [has] seen what [defendant] can do. [Defendant] kills.

\* \* \*

'I think I got one,' the uncontradicted words of a killer, *** defendant, *** those aren't words used by one that was fishing that night. Those were used by one who's hunting, hunting for another live body, *** and that's exactly what he did.

\* \* \*

There is an old saying among lawyers that when you got the facts on your side, you argue the facts. When you got the law on your side, you argue the law. And when you have nothing, you just argue. And what did [defense counsel] do for the first 20 minutes of his argument was talk to you about the Bill of Rights, the Constitution, Judeo-Christian beliefs."

[Objection by defense counsel.]

"What does that have to do about this case. Nothing. He is trying to *** divert your attention from the real life evidence that you heard *** divert your attention from what really happened at that corner of Damen and Blue Island."

At the close of the evidence, the jury found defendant guilty of murder. Thereafter, defendant filed a motion for a new trial, asserting, *inter alia*, that the State failed to prove him guilty of murder beyond a reasonable doubt; he was denied due process and equal protection of the law; he was deprived of a fair trial by prejudicial and inflammatory comments about gang affiliation by the prosecutor during closing argument; the trial court erred in admitting evidence that defendant fled the jurisdiction after the murder; and the court erred in denying defendant's request to cross-examine the State's witnesses regarding two other shootings that allegedly occurred on the same night as the murder; the court erred in precluding defendant from cross-examining one of the State's witnesses as to his bias and motive to testify falsely. The trial court denied defendant's post-trial motion and sentenced him to a term of 27 years. Defendant appeals.

We initially consider whether the State presented sufficient evidence to prove defendant guilty of murder beyond a reasonable doubt.

A court of review examining the sufficiency of evidence as to a defendant's guilt must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781.) A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses, and a conviction will not be reversed unless the evidence is so improbable that it raises a reasonable doubt of the defendant's guilt. *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313.

Defendant argues that he was not proven guilty beyond a reasonable doubt where the evidence was insufficient to establish that he had fired the shot that killed SiFuentes.

Specifically, defendant asserts that Cardona and Ascencio, two of the three occurrence witnesses, were "accomplices" whose testimony was contradictory and had been impeached. Defendant also claims that Lopez was the only "nonaccomplice" witness for the State and that his testimony was not corroborated. Defendant also points out that Lopez could not identify defendant as the person who shot the victim.

■ Contrary to defendant's assertion, we do not believe the record establishes that either Cardona or Ascencio was actually an accomplice. Cardona had previously been tried and acquitted of the shooting, and there was no evidence that Ascencio had any prior knowledge of, or acquiescence in, defendant's apparently spontaneous plan to shoot SiFuentes. (See *People v. Henderson* (1990), 142 Ill. 2d 258, 314, 568 N.E.2d 1234.) Yet, even if these witnesses are considered to be "accomplices," their testimony need not be corroborated in order to be sufficient to prove the defendant's guilt beyond a reasonable doubt. (*People v. Holmes* (1990), 141 Ill. 2d 204, 242, 565 N.E.2d 950.) Because Cardona had already been tried and acquitted of the shooting, he had nothing to gain by testifying against defendant. Indeed, Cardona, who testified under a court-ordered subpoena, stated that he had not wanted to testify because he was afraid and had hired a lawyer in the hope that he would not have to testify. Ascencio testified that he had not made any agreement with the prosecutor in return for his testimony. Ascencio's testimony corroborated many of the facts testified to by Cardona, as did the testimony of Lopez.

The record indicates that on cross-examination, defense counsel fully explored the inconsistencies and omissions in the testimony of the State's witnesses, and he noted those points in his closing argument.

In addition, the State presented evidence that defendant had fled to Mexico after the shooting. This evidence can be considered an indication of defendant's guilt. (See *People v. Autman* (1946), 393 Ill. 262, 266, 65 N.E.2d 772.) Moreover, the testimony of defendant's alibi witnesses was inconsistent and impeached on several critical details. For example, Garza could not identify or describe the bar she and defendant had gone to on the night of the shooting. In addition, although Garza initially testified affirmatively that she was with defendant on the night of the murder, when asked on cross-examination what she did on the Friday before Thanksgiving 1985, Garza said she had stayed home. Similarly, Roman initially stated that he was with defendant on the night of the murder but later testified that he did not know what he had done on the Friday before Thanksgiving 1985.

It is the function of the trier of fact to determine the credibility

of the witness, the weight to be given to his testimony, and the inferences to be drawn from the evidence. (*Holmes*, 141 Ill. 2d at 243.) The jury had the opportunity to view the demeanor of the State's witnesses and to weigh their testimony. Upon consideration of all of the evidence presented, the jury determined that defendant was guilty of murder beyond a reasonable doubt.

Based upon the record presented, we hold that the evidence was not so improbable, unreasonable, or palpably erroneous so as to leave a reasonable doubt that defendant was guilty of murder.

We next address defendant's assertion that the trial court committed reversible error by restricting defendant's right to cross-examine the State's witnesses.

Defendant contends that he was deprived of the right to a fair trial because he was precluded from cross-examining Ascencio about the location of the gun in the hours after the shooting of SiFuentes and about his motive to testify falsely. Defendant also complains that he was improperly prevented from cross-examining Cardona as to his motives for testifying a certain way in his own trial.

The scope of cross-examination is within the discretion of the trial judge and is only subject to review where there has been an abuse of discretion which results in prejudice to the defendant. (*People v. Collins* (1992), 227 Ill. App. 3d 670, 675, 592 N.E.2d 217.) If the record shows that the jury had been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because the defendant had been prohibited on cross-examination from pursuing other areas of inquiry. (*Collins*, 227 Ill. App. 3d at 676; *People v. Maldonado* (1989), 193 Ill. App. 3d 1062, 1069, 550 N.E.2d 1011.) Although an accused may attempt to prove that someone else committed the crime with which he is charged, this right is not without limitations. (*People v. Ward* (1984), 101 Ill. 2d 443, 455, 463 N.E.2d 696.) The admissibility of such evidence depends upon whether it is relevant. (*Ward*, 101 Ill. 2d at 455.) Thus, such evidence may be admitted if it tends to make the question of the defendant's guilt more or less probable. (*Ward*, 101 Ill. 2d at 455.) A trial court may exclude evidence as irrelevant if it has little probative value due to its remoteness, uncertainty or its possibly unfair prejudicial nature. *Ward*, 101 Ill. 2d at 455.

In the instant case, the defendant sought to introduce evidence that the gun which was used in the shooting of SiFuentes had been used by someone other than the defendant in two shootings which occurred in the hours after SiFuentes was killed. Defense counsel argued that this evidence was relevant and admissible because it tended to establish that the defendant had not fired the

shot that killed SiFuentes. Yet, defense counsel did not present an offer of proof that Ascencio, Cardona or someone else, other than the defendant, had possession of the gun at the time SiFuentes was shot. No evidence or offer of proof was presented to establish that the same gun had definitely been used in the two shootings later that night or, even if the same gun had been used, that the gun could not have been passed from the defendant to someone else after SiFuentes was killed. The State's witnesses had testified that the gun had been passed from one individual to another at least once on the night of the shooting. The jury was charged with determining whether defendant was guilty of shooting SiFuentes as he stood outside a restaurant near the intersection of Blue Island and Damen at approximately 11 p.m. on November 22, 1985. The fact that someone else might have had possession of and might have used the gun later was not probative of defendant's guilt because it did not establish that defendant did not have possession of the gun at the time SiFuentes was killed. Thus, the subsequent location and possible use of the gun had no bearing on the issue of whether defendant fired the shot that killed SiFuentes. Consequently, this evidence did not make the issue of defendant's guilt more or less probable. In addition, this evidence was speculative, uncertain, and possibly misleading where there was no evidence or offer of proof that Cardona, Ascencio, or any other person had committed the subsequent shootings. In light of the fact that defense counsel was permitted to cross-examine Cardona and Ascencio on virtually all other aspects of their testimony, we do not believe that the court abused its discretion in excluding the evidence of the two subsequent shootings. *Ward*, 101 Ill. 2d at 455-56; *Collins*, 227 Ill. App. 3d at 676.

We also do not believe it was an abuse of discretion to preclude cross-examination of Cardona as to his motive for testifying a certain way at his own trial.

■ Generally, a witness may be cross-examined on matters that would show bias or motive to testify falsely. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 441, 521 N.E.2d 38.) Yet, the trial court may limit the cross-examination of a witness where the defendant has been allowed to make the jury aware of adequate factors concerning relevant areas of impeachment of the witness, even if the defendant has been prohibited from pursuing other areas of inquiry on cross-examination. (*Collins*, 227 Ill. App. 3d at 676; *Maldonado*, 193 Ill. App. 3d at 1069.) Although a witness may be impeached through a showing of bias, interest, or motive to testify falsely, the evidence sought to be used must give rise to the inference that the witness has something to gain or to lose by his testimony. (See *People v. Triplett*

(1985), 108 Ill. 2d 463, 475-76, 485 N.E.2d 9; *Collins*, 227 Ill. App. 3d at 676.) Cardona acknowledged that he had been tried and acquitted of the shooting, and defense counsel aggressively questioned him about his testimony at his own trial. Through this cross-examination, defense counsel effectively brought out the inconsistencies and weaknesses in Cardona's testimony in the instant case. In this case, the jury was well aware of the factors concerning the relevant areas of Cardona's impeachment. See *Collins*, 227 Ill. App. 3d at 676; *Maldonado*, 193 Ill. App. 3d at 1069.

Based upon this record, we hold that defendant was not deprived of the right to a fair trial because his cross-examination of the State's witnesses was limited.

Finally, we consider defendant's contention that he was deprived of the right to a fair trial by inflammatory and prejudicial comments made by the prosecutor during closing argument.

■ We observe that defendant's post-trial motion asserted only that he was deprived of the right to a fair trial by the prosecutor's comments relating to "gang affiliation." Thus, the particular comments not specified in the motion were not properly preserved for review. See *People v. Turner* (1989), 128 Ill. 2d 540, 555, 539 N.E.2d 1196; *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.

Yet, even if defendant had properly preserved this issue for appeal, we do not believe that the remarks of the prosecutor warrant a new trial.

Prosecutors have a great deal of latitude in making closing arguments, and the trial court's determination as to the propriety and possible prejudicial effect of closing arguments will be upheld absent a clear abuse of discretion. (*People v. Pasch* (1992), 152 Ill. 2d 133, 184-85, 604 N.E.2d 294; *People v. Smothers* (1973), 55 Ill. 2d 172, 176, 302 N.E.2d 324.) Arguments and statements based upon the facts in evidence, or upon reasonable inferences drawn therefrom, are within the scope of proper argument. (*People v. Terry* (1984), 99 Ill. 2d 508, 517, 460 N.E.2d 746.) Even where certain remarks are found to be improper, they will not be considered reversible error unless they constitute a material factor in the defendant's conviction or result in substantial prejudice to the accused, such that the verdict would have been different had it not been made. *Terry*, 99 Ill. 2d at 517.

In reviewing allegations of prosecutorial misconduct, the closing arguments of both the State and of defense counsel must be examined in their entirety, and the allegedly improper remarks must be placed in the proper context. *People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76, 514 N.E.2d 970.

Defendant first complains that it was error for the prosecutor to state that the statement "I think I got one," allegedly spoken by defendant after he fired the gun at SiFuentes, were "the uncontradicted words of a killer." In his brief, defendant asserts that this statement was contradicted by his presentation of an alibi defense. Defendant asserts further that this statement constituted an improper comment on his failure to testify at trial.

A prosecutor may describe the State's evidence as "uncontradicted" even where the defendant is the only person who could have contradicted the evidence. Such a comment will not be considered error where it is intended to demonstrate the strength of the State's case and the absence of defense evidence. See *People v. Lyles* (1985), 106 Ill. 2d 373, 390, 478 N.E.2d 291; *People v. Bryant* (1983), 94 Ill. 2d 514, 524, 447 N.E.2d 301; *People v. Smith* (1988), 165 Ill. App. 3d 905, 913, 520 N.E.2d 841.

When considered in the context of the prosecutor's argument, this statement cannot be characterized as an attempt to improperly comment on the defendant's failure to testify at trial. Because there was no testimony or other evidence which directly contradicted the testimony that Cardona heard defendant say "I think I got one," this statement by the prosecutor was a proper comment upon the evidence adduced at trial.

Defendant also complains that the prosecutor's statement that defendant was "hunting for another live body" implied that he had committed more than one murder. However, when considered within the context of the prosecutor's other statements, the remark that defendant was "hunting for another live body" does not imply that defendant was responsible for more than one murder. Rather, this comment indicates that defendant's conduct was deliberate and that he had intended to kill the victim.

Defendant next asserts that the prosecutor erred in stating that Cardona was "scared to death" because "he has got the eyes of death staring him down." The record reveals that this statement was in response to defense counsel's argument that he did not believe Cardona was afraid of defendant. In addition, Cardona stated that he testified under a court-ordered subpoena and had hired a lawyer so that he would not have to testify because he was afraid; this comment may be characterized as an inference which may properly be drawn from the evidence. Moreover, the fact that the jury apparently saw tears in Cardona's eyes at the conclusion of his testimony supports the conclusion that the prosecutor's statement can be considered a fair inference based upon the evidence.

Defendant also contends that the prosecutor attempted to shift

the burden of proof and disparaged defendant's attorney in stating that defense counsel had attempted to divert the jury's attention by arguing about the Bill of Rights, the Constitution, and about Judeo-Christian beliefs.

It is generally improper to accuse defense counsel of perjury and fraud or to characterize defense counsel as unethical or underhanded. (*Turner*, 128 Ill. 2d at 561.) Yet, in analyzing the propriety of any statement, it must be read in context. *Turner*, 128 Ill. 2d at 561.

These statements by the prosecutor did not actually attack the integrity of defense counsel, but merely constituted a comment as to the persuasiveness of the defendant's theory of the case and as to the evidence presented to support that theory. Where the prosecutor's statements can be considered as a comment on the merit, likelihood, and strength of the defendant's case, it will not constitute reversible error. (See *People v. Hooper* (1989), 133 Ill. 2d 469, 489, 552 N.E.2d 684; *People v. Phillips* (1989), 127 Ill. 2d 499, 526, 538 N.E.2d 500; *People v. Tiller* (1982), 94 Ill. 2d 303, 320, 447 N.E.2d 174.) When considered in context, the prosecutor's comments do not appear to have been meant as an attack on the ethics or tactics of defense counsel. See *Turner*, 128 Ill. 2d at 561.

Based upon the record before us, we hold that the prosecutor's remarks did not result in substantial prejudice or constitute a material factor in defendant's conviction. Thus, these comments did not operate to deprive defendant of a fair trial.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

EGAN, P.J., and McNAMARA, J., concur.