THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SERGIO RESENDEZ, Defendant-Appellant.

First District (1st Division)    No. 1—93—1119

Opinion filed June 30, 1995.

Robert M. Hodge, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Kim A. Novi, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant, Sergio Resendez, was found guilty of first-degree murder. The circuit court denied all of defendant's post-trial motions and, after a hearing, sentenced defendant to 25 years in the Illinois Department of Corrections. On appeal defendant argues: (1) the admission of gang evidence was improper because it was not relevant to the issue of motive, and (2) the State's closing remarks based on gang warfare were inflammatory and exceeded the bounds of proper argument.

Defendant was charged by indictment with the murder of Josephina Crespo. The State elected to try defendant as an adult and a jury trial commenced on January 19, 1993. The State's first witness was Arturo Nino. Nino testified that on June 10, 1992, at about 6:30 p.m., he went to the K mart on 51st and Kedzie with his brother, Armando Jacobo, and a friend, Sergio Diaz, to buy a TV antenna. While they were in the store, a group of four young men in the toy section began making rude comments to the three of them. He identified defendant as one of the men in the group.

While Nino was waiting at the exit for Jacobo and Diaz to pay for the antenna, three of the men walked past him and flashed gang signs. Defendant was one of these individuals. Specifically, one of the individuals was "throwing up the crown," which indicated to Nino

that they were members of the Latin Kings street gang. In June 1992, Nino was a member of the Satan Disciples street gang, which is a rival gang of the Latin Kings. One of the individuals also "threw down the forks," which is interpreted as an insult to the Disciples. Nino does not remember which individual made the hand signals.

One of the individuals insulted Nino and told him to step outside. He followed the three individuals out of the store, and someone other than defendant approached him. Suddenly, Jacobo came out of the store, and the three individuals ran. Jacobo chased defendant and one other toward the north side of the K mart parking lot. As Jacobo was chasing them, Nino heard three gunshots. After the second and third shots, Nino saw a woman fall off her bicycle and soon after there was a pool of blood around her.

Nino ran toward Jacobo to tell him it was a real gun. At this point Jacobo had his weight-lifting belt in his hands. Jacobo wore a belt four to five inches thick because he had a bad back and his job involved heavy lifting. After Jacobo realized that the gun was real, he stopped running. The other men ran into a yard and went behind a fence. Nino identified defendant as the individual firing the gun at Jacobo. He saw defendant hold the gun with both hands at chest level.

Nino spoke to the police at the scene and gave descriptions of the three individuals. He drove around the neighborhood with the police and identified defendant and another individual on the street. Nino later identified defendant and the others in a lineup.

On cross-examination, Nino said that he knew that the K mart was Latin Kings' territory. He stated that he was angry because the Latin Kings had shot another brother of his two months earlier. He had been a Disciple for about two months at the time of the incident.

The State's next witness was Armando Jacobo. Jacobo testified that while he was in the K mart paying for a TV antenna he noticed his brother, Nino, exit the store in the company of three other individuals. He ran out of the store because he thought his brother was in danger. The three individuals, one of whom Jacobo identified as defendant, fled northwest. Defendant was running two or three steps ahead of the other two. One of the individuals, other than defendant, took out a gun and shot at him. Jacobo stood still after the first shot, but then continued to run because he thought the individual was shooting a cap gun. Then defendant turned around, pointed the gun, and fired shots at him. Jacobo took off his weight-lifting belt and chased them again. He stated that defendant stopped running, turned around, and "got in a stance." Defendant "threw up the crown" and said "King love," and then he shot at Jacobo again. The other individuals were encouraging defendant to shoot Jacobo. Nino

yelled that it was a real gun and Jacobo ran back to where the woman had been shot. Jacobo saw defendant and the others run through a fence. He later identified defendant and the others in a lineup.

Jacobo was not a member of any gang at the time of this incident, but he was a member of the Satan Disciples at one time. He testified that the Satan Disciples are aligned with the "Folks" nation and the Latin Kings are aligned with the "People" nation. He further stated that the two nations were at war with each other. Officer Thomas Daley testified that on June 10, 1992, he was assigned to the 8th District patrol. Earlier that day he saw the victim, Josephina Crespo, working at a restaurant on his beat, and later the same day he saw the victim lying on the ground in the K mart parking lot. Officer Daley interviewed witnesses and sent descriptions of the suspects out over the radio. Later he took Nino to identify several suspects. Finally, Officer Daley and his partner went to Mt. Sinai Hospital that evening and learned that Ms. Crespo had died.

Detective John Halloran testified that at approximately 7:30 p.m., he and his partner were assigned to go to 5050 South Kedzie to investigate a report of a woman shot in the K mart parking lot. He searched for evidence and interviewed some witnesses. Detective Halloran conducted a lineup where Nino and Jacobo identified defendant as the shooter. He testified that Jacobo had told him that he took off his weight-lifting belt when he exited K mart and then the three individuals ran.

The State presented a stipulated statement of the testimony of Dr. Yuksel Konakci, an employee of the office of the Cook County medical examiner. He conducted an autopsy on the body of Josephina Crespo on June 11, 1992. Dr. Konakci's opinion was that the cause of death was a gunshot wound of the chest which passed through the lung and chest area.

The State called Jason Wepsiec as its next witness. At the time of the incident Wepsiec was a 15-year-old eighth grader at Gonzalez Academy and a member of the Latin Kings. He identified other Latin Kings gang members, including defendant. Wepsiec gave testimony as to gang nicknames, colors, hand signs and rivalries.

Wepsiec testified that on June 10, 1992, he met defendant and other fellow gang members and they made plans to go to K mart at 51st and Kedzie to buy markers for graffiti. Wepsiec testified that he saw a gun in James Connors' waistband while they were walking to K mart. Wepsiec went into Little Caesar's while others in the group stayed in K mart. When Wepsiec came out of Little Caesar's, he saw squad cars and an ambulance in the K mart parking lot. He left K mart and later met up with Connors. The two of them went to Wep-

siec's house, where Connors changed clothes. They then went to 55th and Sawyer to retrieve the gun used in the incident. They returned to Wepsiec's house and hid the gun in his parents' car.

On cross-examination, Wepsiec said he had quit the Latin Kings, even though it meant a three-minute beating. He had been a Latin King for about a year at the time of the incident and defendant had been a member for about three weeks. On redirect, Wepsiec was asked why the gun was brought to K mart. He replied: "We brought it to the K mart for protection in case something happened. If another rival gang jumped out, we were going to use it to scare them away, not to shoot someone."

Assistant State's Attorney William Carlos Weeden was assigned to the felony review unit on the night of the incident. Weeden testified that he interviewed defendant at about 4:40 a.m., on June 11, 1992, in the presence of Detective Boudreau and youth officer Danaher. Weeden stated that he advised defendant of his constitutional rights and his rights as a juvenile. He discussed the incident with defendant and defendant agreed to have him prepare a handwritten statement. Weeden prepared this statement and defendant read it and signed the bottom of each page. Weeden identified the handwritten statement that he prepared on June 11, 1992, and he read the statement into evidence.

The statement stated that defendant bought a .38 revolver with a six-shot chamber from someone on the street for $50, and he lent the fully loaded gun to Connors. On June 10, 1992, at approximately 7 p.m., defendant went to K mart with Connors and other friends. Inside the K mart they saw some Disciple gang members who flashed gang signs at them. Defendant stated that he and the others were Latin Kings and that he had been a member for three weeks. After the confrontation with the Disciple gang members, defendant, Connors, and two others went outside and stood by the bike racks. One of the Disciples came outside where they were standing and began to flash gang signs again. Specifically, the Disciple was "putting up the fingers in a pitchfork fashion and flashing disrespect for the Latin Kings by putting the fingers in a crown fashion and pointing them to the ground." At this time another Disciple came outside of the K mart. This Disciple had a big weight-lifter's belt and he was yelling at defendant and his friends. Defendant and his friends began to run. Defendant ran down one aisle of cars and Connors ran down another aisle of cars. The Disciple with the weight-lifting belt ran after Connors.

Defendant then heard gunshots and ran toward Connors, who was holding the same gun that he had loaned him earlier in the

week. Defendant grabbed the gun from Connors and continued to run. He stopped and took one shot at the Disciple with the belt and then continued to run through the parking lot. The Disciple was still chasing them so defendant stopped and took two more shots. After shooting the second time, defendant and his friends ran across the street into the gangway and the Disciples stopped chasing them. They ran to Stevie Boy's restaurant, where one of them bought some food. After they left the restaurant, they walked to an alley where defendant gave the gun back to Connors. Defendant then walked in a different direction than Connors and the police stopped him at 56th and Spalding.

The defense presented defendant as its only witness. Defendant testified that he did not know Connors had a gun with him when they went to K mart. He also stated that he had been a Latin King for three weeks. Defendant testified that Connors fired three shots as they were running through the K mart parking lot. As they ran to the edge of the parking lot, Conners handed the gun to defendant and he fired one shot up in the air over his shoulder. Defendant stated that while Jacobo was chasing them, he was afraid of being hit by the weight-lifting belt buckle. Defendant claimed that Assistant State's Attorney Weeden never advised him of his rights while he was in custody. He also claimed that he never told Weeden that he bought the weapon a week earlier. Finally, defendant stated that he never read the statement prepared by Weeden and he only signed it because he was threatened.

On cross-examination, defendant stated that he had been initiated into the Latin Kings three weeks prior, and he joined because he thought it would be fun. He thought that the K mart was within the Latin Kings territory, and he testified that gang members do not want rival gang members on their turf. Defendant further stated that this incident was the first time he ever faced an opposing gang member and he was a little scared. Defendant testified that the Disciples ''threw up the pitch fork'' in K mart, but he denied having flashed any gang signs during the incident. He demonstrated the signs of the crown and the pitchfork and explained the meanings for the signs. Defendant also testified that the Latin Kings colors are black and gold, and in order to be a Latin King he had to know the hand signs and gang colors.

The State called two rebuttal witnesses. The first was Officer Kenneth Boudreau. Officer Boudreau essentially affirmed the testimony given earlier by Assistant State's Attorney Weeden. The second rebuttal witness was youth officer Patrick Danaher. He testified that he was present during the interview of defendant by

Weeden. His account of the interview matched those of Weeden and Boudreau.

During closing arguments, the State argued that the war between the street gangs motivated defendant's actions. Specifically, the assistant State's Attorney argued:

> "We have a gang war going on in Chicago. The war is between the People and the Folks . . . The People, the Latin kings, the black and gold, the crown. You heard him tell it to us. That's their gang and he thought it was fun. That is what the gangs are about: Hand signs, crowns, disrespect, respect. They have as Jason told us a rivalry with other gangs. Those who make up a nation are known as the Folk. Yes, this going on on our streets. This is happening on our streets. They are at war. They are their enemies. The Disciples are the Kings' enemies ***."

The State also argued that innocent people get killed when they get caught in "gang warfare" and "gang banging." The defense objected to the State's closing arguments based on gang warfare. The circuit court overruled all objections as to these arguments. The jury returned a verdict of guilty of first-degree murder.

Defendant filed motions for judgment notwithstanding the verdict, for a new trial, and for defendant to be sentenced as a juvenile. The motion for new trial raised four grounds, one of which was that the State made improper and inflammatory references to defendant's gang affiliation in its closing argument. The circuit court denied all of defendant's motions and sentenced defendant to 25 years' imprisonment.

## I

■ Defendant's first contention is that the gang-related evidence was irrelevant and improperly admitted. This issue has not been preserved for appeal because defendant neither objected to the admission of this evidence at trial nor set out an objection in a prompt post-trial motion. (*People v. Towns* (1993), 157 Ill. 2d 90, 99-100, 623 N.E.2d 269, 273.) The plain error doctrine allows a reviewing court to consider errors affecting substantial rights not properly preserved for review where the evidence is closely balanced or "the error is so fundamental and of such magnitude that the accused was denied a fair trial." (*People v. Herrett* (1990), 137 Ill. 2d 195, 210, 561 N.E.2d 1, 7-8.) However, we find the plain error doctrine inapplicable here because the evidence was not closely balanced and the gang-related evidence was clearly relevant to show motive and was properly admitted in this case.

Although gangs are regarded with considerable suspicion, gang-related evidence need not be excluded if it is otherwise relevant and

admissible. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 489, 568 N.E.2d 864, 867; *People v. Smith* (1990), 141 Ill. 2d 40, 58, 565 N.E.2d 900, 907.) Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more or less probable than it would be without the evidence. (*Gonzalez*, 142 Ill. 2d at 487-88, 568 N.E.2d at 867.) Although motive is not an essential element of murder, it is generally held that evidence indicating the defendant was a member of a gang or was involved in gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act. (*Smith*, 141 Ill. 2d at 58, 565 N.E.2d at 907.) However, gang-related evidence is only admissible where there is sufficient proof that the evidence is related to the crime charged. *Smith*, 141 Ill. 2d at 58, 565 N.E.2d at 907; *People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840, 854.

In *People v. Colon* (1994), 162 Ill. 2d 23, 642 N.E.2d 118, the most recent Illinois Supreme Court case addressing this issue, the defendant was found guilty of first-degree murder for the drive-by shooting of Rafael Matamoros. There was testimony that the shooting took place in Latin Kings' territory and that the shots were aimed at a group of six people. The group included four Latin Kings gang members, but the victim was not a gang member. The defendant admitted to a police officer that he was a member of the Imperial Gangsters and that he lived in Imperial Gangster territory. There was also testimony indicating that Latin Kings are affiliated with the "People," and Imperial Gangsters are affiliated with the "Folks," and that the "People" and the "Folks" do not get along. The supreme court held that the trial court did not abuse its discretion in denying the defendant's motion *in limine* to exclude gang-related evidence. (*Colon*, 162 Ill. 2d at 30, 642 N.E.2d at 121.) The court stated that the testimony "was clearly relevant to establish that the motive for the shooting was generally one of gang rivalry." *Colon*, 162 Ill. 2d at 30, 642 N.E.2d at 121.

In the present case, there is even more evidence than existed in *Colon* to support the State's theory that the initial confrontation and the ultimate shooting were motivated by the rivalry between the Disciples and the Latin Kings. According to Wepsiec, they brought the gun to K mart for protection "in case a rival gang jumped out." In addition, Jacobo testified that defendant yelled "King love" before he shot the gun and that the Latin Kings and Disciples were at war with each other. Finally, defendant stated that this was his first rival-gang confrontation and that the K mart was the territory of the Latin Kings. Defendant argues that the shooting did not arise from a

gang confrontation or its aftermath, but rather from self-defense. However, defendant's theory of self-defense is not a sufficient reason for keeping probative evidence from the jury. The gang-related evidence was relevant to show that gang rivalry motivated defendant's actions and it was properly admitted. *People v. Colon*, 162 Ill. 2d at 231, 642 N.E.2d at 121; *People v. Young* (1994), 263 Ill. App. 3d 627, 636, 635 N.E.2d 473, 481.

Defendant relies on *People v. Goldsberry* (1994), 259 Ill. App. 3d 11, 630 N.E.2d 1113, for his argument that the gang-related evidence was irrelevant to motive. In *Goldsberry*, the defendant was confronted by two men when he was leaving his high school. The defendant had been confronted by the same two men prior to the incident. The defendant shot at the men, killing one of them. The State admitted into evidence two notebooks belonging to the defendant, which contained poems and drawings. An expert testified that the poems and drawings were consistent with gang membership. The defendant had filed a motion *in limine* to keep the notebooks out of evidence because they would be used to incite the jury, but the circuit court denied the motion. (*Goldsberry*, 259 Ill. App. 3d at 14, 630 N.E.2d at 1115.) On appeal, the divided court held that the circuit court erred in finding that the probative value of the notebooks outweighed their prejudicial effect. Specifically, the court held that although there was evidence of the victim's gang membership, there was no evidence that the defendant was a gang member at the time of the shooting, was engaged in any gang-related activity, or felt any gang-related animosity toward the victim. *Goldsberry*, 259 Ill. App. 3d at 17-19, 630 N.E.2d at 1117.

We find *Goldsberry* to be easily distinguishable on its facts. Unlike the evidence in *Goldsberry*, the evidence in this case shows that the shooting was gang-related. Defendant himself admitted to being a member of the Latin Kings. The testimony also indicates that the men involved felt gang-related animosity toward each other. Three witnesses, including defendant, testified that gang signs were flashed inside K mart and in the parking lot. We also find significant the fact that the victim in this case was an innocent bystander. Without the gang-related evidence to provide a motive, defendant's actions are otherwise inexplicable. The evidence tended to show why such a senseless murder occurred. Finally, there was no indication that defendant had been threatened by or had any contact with the Disciple members prior to this incident, as the defendant in *Goldsberry* had. Thus, defendant's reliance on *Goldsberry* is not persuasive.

## II

■ Defendant's second contention is that the State's closing statements referring to defendant as a "gang banger" were inflammatory and exceeded the bounds of proper argument. The State argues that defendant failed to preserve this issue for appeal as well. Defendant's post-trial motion asserted that the State made improper and inflammatory comments during rebuttal closing argument by repeatedly mentioning defendant's gang affiliation and arguing that defendant's motivation in the shooting was the advancement in his gang. Particular comments were not specified in the motion and, therefore, this issue has not been properly preserved for review. *People v. Herrera* (1994), 257 Ill. App. 3d 602, 617, 629 N.E.2d 546, 557 (holding defendant's post-trial motion did not properly preserve issue for review where it "asserted only that he was deprived of the right to a fair trial by the prosecutor's comments relating to 'gang affiliation' "); see also *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130; *People v. Rodriguez* (1992), 236 Ill. App. 3d 432, 440, 602 N.E.2d 1326, 1331.

However, we find that even if this issue had not been waived, the State's closing argument was properly based on the evidence. The State is generally permitted great latitude in closing argument, although statements must be based upon the facts in evidence or upon reasonable inferences drawn therefrom. (*People v. Page* (1993), 156 Ill. 2d 258, 276, 620 N.E.2d 339, 349.) The trial court's determination as to the propriety of closing remarks will be upheld absent a clear abuse of discretion. (*Herrera*, 257 Ill. App. 3d at 617, 629 N.E.2d at 557.) To constitute reversible error, the complained-of comments must have resulted in substantial prejudice to the accused such that absent those comments the result would have been different. *People v. Morgan* (1986), 112 Ill. 2d 111, 132, 492 N.E.2d 1303, 1311.

The State argued that the war between the Latin Kings and the Disciples motivated defendant's actions. This argument was based on the testimony which indicated that such a gang war existed and that defendant was a member of one of these gangs. Where evidence of gangs and gang membership is properly admitted during a trial, it is subject to comment during closing argument. (*People v. Nichols* (1992), 235 Ill. App. 3d 499, 507, 601 N.E.2d 1217, 1232.) The State's closing argument was proper because it was based on properly admitted gang-related evidence and the reasonable inferences drawn therefrom. Thus, the trial court did not abuse its discretion by overruling defendant's objections and denying his motion for new trial.

Accordingly, for the foregoing reasons, defendant's conviction is affirmed.

Affirmed.

CAMPBELL, P.J., and GORDON, J., concur.